UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| RODERIC L.,<br><br>                    Plaintiff,<br><br>     vs.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION;<br><br>                    Defendant. | **4:21-CV-04028-VLD**<br><br>MEMORANDUM OPINION AND<br>ORDER |

**INTRODUCTION**

Plaintiff, Roderic L., seeks judicial review of the Commissioner's final decision denying his application for Supplemental Security Income under Title XVI of the Social Security Act.[1]

Mr. L. has filed a complaint requesting reversal of the Commissioner's final decision denying him disability benefits and "remand[ing] for further development under the fourth sentence of 42 U.S.C. [§] 405(g)." See Docket Nos. 1, 17, & 18. The Commissioner asks the court to affirm its decision below. See Docket No. 19.

---

[1] Section 1383(c)(3) provides that the final determination of the Commissioner as to an application for Title XVI benefits shall be subject to judicial review as provided in 42 U.S.C. § 405(g) and to the same extent as § 405 authorizes review of final determinations as to applications for social security disability benefits under Title II of the Social Security Act. The court references standards of review under § 405 where appropriate herein.

This appeal of the Commissioner's final decision denying benefits is properly before this court pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).  The parties have consented to this United States Magistrate Judge handling this matter pursuant to 28 U.S.C. § 636(c).  See Docket No. 7.

## FACTS[2]

### A.     Procedural History

This action arises from Mr. L.'s application for Supplemental Security Income ("SSI") with a protected filing date of May 16, 2018, alleging disability starting March 1, 2018, due to a broken left collar bone, COPD, high blood pressure, high cholesterol, acid reflux, depression, seizure disorder, blurry vision, difficulty concentrating, memory loss, shortness of breath, and unspecified heart issues.  T262, 264, 270, 293.[3]

Mr. L.'s claims were denied at the initial and reconsideration levels, and Mr. L. requested an administrative hearing.  T102, 112, 119.

Mr. L.'s administrative law judge ("ALJ") hearing was held on April 3, 2020, where different counsel represented Mr. L.  T36.  An unfavorable decision was issued May 13, 2020, by the ALJ.  T12.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 16).  Unless otherwise noted, the court has made only minor grammatical and stylistic changes.

[3] Citations to the appeal record will be cited as "T" followed by page number or numbers

At step one of the evaluation, the ALJ found that Mr. L. "ha[d] not engaged in [substantial gainful activity] since March 1, 2018, the alleged onset [of disability] date." T17.

At step two, the ALJ found that Mr. L. had a severe impairment of "epilepsy; chronic obstructive pulmonary disease (COPD); depression; and alcohol abuse." Id.  The ALJ found that each of those impairments "significantly limited [Mr. L.'s] ability to perform basic work activity for a continuous period of 12 months or more." Id.  The ALJ also found that Mr. L.'s medically determinable impairments of "GERD, high blood pressure, high cholesterol, and history of a fractured collarbone with repair" were "non-severe." T18.

At step three, the ALJ found "[e]ven with substance use, [Mr. L.] did not have any impairment or a combination thereof meeting or medically equaling" a listing.  Id.  The ALJ stated Mr. L. had "no" limitation "[i]n understanding, remembering, or applying information." Id.  The ALJ stated Mr. L. reported decreased memory, "but such impairment relates more to alcohol usage." Id. The ALJ found Mr. L. had "moderate" limitations "[i]n interacting with others" and stated, "[h]e has presented as pleasant and cooperative with appropriate behavior." T18-19.  "However, with alcohol use, there are reports of suicidality and anxiety, which could influence his ability to get along with others or handle stress." T19.

The ALJ found Mr. L. had a "mild" limitation in "concentrating, persisting, or maintaining pace." Id.  The ALJ found "marked" limitations "in

3

adapting or managing oneself" and stated "[t]he medical record demonstrates diminished functioning due to alcohol abuse," noting three psychological inpatient stays for suicidal ideation having cut his wrists and overdosed on his medication. Id. The ALJ stated, "no State agency psychological consultant concluded that the claimant meets a mental listing with substance abuse." T20.

The ALJ determined that, including substance abuse, Mr. L. would have a residual functional capacity ("RFC") to "lift and carry 50 pounds occasionally and less than 25 pounds frequently. He can sit a total of 6 hours, as well as stand and walk, combined, a total of 6 hours in an 8-hour workday. He has no limits reaching. He can climb stairs occasionally, but must avoid climbing ladders, scaffolds, and similar devices. He can frequently balance, crouch, kneel, stoop and crawl." Id. The ALJ stated Mr. L.'s RFC included "mild limits in understanding, remembering, and carrying out instructions, . . . mild limits in concentration, persistence, and pace[,] . . . moderate limits interacting" with the public, co-workers and supervisors, and a marked limitation "in adapting and [he would] likely be absent two to three days of work per month." Id.

The ALJ found that "[Mr. L.'s] statements concerning the intensity, persistence, and limiting effects [were] generally consistent with the evidence when substance abuse is included." T21.

The ALJ found at step four that Mr. L. was "unable to perform any past relevant work." T22-23.

The ALJ found "[Mr. L.] is an individual of advanced age," as defined in 20 C.F.R. § 416.963.  T23.

The ALJ found at step five, relying on the testimony of a vocational expert, that, "including substance use disorder, there were no jobs existing in significant numbers in the national economy" Mr. L. could perform.  Id.

The State agency medical consultants found no exertional limitations. T92.  They, however, did find postural limitations based on a right clavicle fracture and environmental limitations based on Mr. L.'s medical history of seizure disorder and chronic obstructive pulmonary disease ("COPD").  T92-94. The ALJ accepted and incorporated Mr. L.'s reported medical history of seizure disorder and COPD into his findings.  T23.  The ALJ found Mr. L.'s medical history was consistent with a medium level of exertion and range of work with postural and environmental limitations.  T20, 22, 25.

The ALJ considered the opinions of a state agency psychological consultant as to Mr. L.'s limitations including alcohol abuse, noting they found "marked limits in paragraph 'b' criteria, except for interaction, given his history of alcohol abuse."  T22.  The ALJ also noted that "[p]sychological expert, Kevin Schumacher, Ph.D., testified that [Mr. L.] would have marked limits in these areas, when actively using alcohol."  Id.  The ALJ found "these opinions [were] persuasive and consistent with the record."  Id.

The ALJ found that Mr. L.'s "substance abuse disorder [was] a contributing factor material to determining disability because [Mr. L.] would not have a disability if he stopped substance use."  T27.

5

The ALJ then found that, if Mr. L. stopped his substance abuse, he would still have severe impairments, including seizures, depression, and COPD. T23-24.

The ALJ found that "[i]f [Mr. L.] stopped substance use, he would not have an impairment or combination thereof meeting or medically equaling" a listing.  T24.  The ALJ stated Mr. L. had "no" limitation "[i]n understanding, remembering, or applying information." Id.  The ALJ found Mr. L. had "moderate" limitation "[i]n interacting with others." Id.  The ALJ found Mr. L. had a "mild" limitation in "concentrating, persisting, or maintaining pace," and a "moderate" limitation in "adapting or managing oneself." T24-25.

The ALJ determined that if Mr. L. stopped his substance abuse, he would have an RFC to perform medium work as follows: "lift and carry 50 pounds occasionally" and "less than 25 frequently." T25. "He can sit a total of 6 hours, as well as stand and walk, combined, a total of 6 hours in an 8-hour workday.  He has no limits reaching.  He can climb stairs occasionally, but must avoid climbing ladders, scaffolds, and similar devices.  He can frequently balance, crouch, kneel, stoop, and crawl." Id.  The ALJ stated Mr. L.'s RFC included "mild limits in understanding, remembering, and carrying out instructions, . . . mild limits in concentration, persistence, and pace[,] . . . moderate limits in interacting" with the public, co-workers and supervisors, and no limits in adapting, or ongoing absences.  T25-26.

The ALJ found at step four, based on an RFC that excluded Mr. L.'s substance abuse, that Mr. L. would be "unable to perform any past relevant work." T25, 27.

The ALJ found at step five, relying on the testimony of a vocational expert, that "[i]f [Mr. L.] stopped the substance use . . . there are jobs existing in significant numbers in the national economy [Mr. L.] can perform." T27.

Mr. L. requested review of the ALJ's denial from the Appeals Council, which was denied making the ALJ's decision final. T1, 260. Mr. L. timely filed this action.

## B. Medical Evidence Before the Adjudicated Period Began on March 1, 2018

Mr. L. was seen at the Rapid City Regional Hospital on November 23, 2017, with complaints of right-sided back pain that started months ago but worsened that day. T503. Mr. L. also complained of burning urination, right-sided abdominal pain, nausea, and vomiting. Id. Mr. L. denied any other physical complaints. Id. Mr. L.'s pain was exacerbated with movement and palpation. Id. Examination revealed no edema in the musculoskeletal system, right CVA tenderness, and the psychiatric finding was that Mr. L. was uncooperative. T505. Toradol was administered and he was discharged. T507.

Mr. L. was seen at the Rapid City Regional Hospital on December 1, 2017, again with complaints of right-sided flank pain. T508. Review of Systems was negative for back and neck pain and negative for weakness and headaches. T509. Examination revealed no edema, tenderness in the sharp

7

right flank, and normal mood and affect.  Id.  Fluids and pain medication were given, and he was discharged.  T511.

Mr. L. was seen at the Rapid City Regional Hospital on December 20, 2017, with right-sided pain that had been ongoing the last two weeks but worsened that evening when he fell out of a vehicle landing on his right side on the concrete curb.  Id.  Mr. L. did not know if he lost consciousness.  Id.  Examination revealed right CVA tenderness, no edema in the musculoskeletal system, no focal deficits, and normal mood and affect.  T513.  Mr. L. was given Zofran for nausea, Toradol for pain, and was discharged.  T516.

## C.    Medical Evidence Between Mr. L.'s Onset Date and the Date of the ALJ's Decision

Mr. L. was seen at the Rapid City Regional Hospital on March 3, 2018, with complaints of right-flank pain that developed two days earlier when he fell on some ice and landed on his right side and hit his head.  T517.  The note stated that Mr. L. occasionally drank alcohol and reported drinking earlier that evening.  Id.  Examination revealed abdominal tenderness across the right upper quadrant and tenderness to palpation across the right flank, no gross weaknesses, and normal affect.  T518.  Zofran was given for nausea and morphine was given for pain.  T520.  Mr. L.'s alcohol level was 318 mg/dL—80 mg/dL is considered legally intoxicated.  T519.  The note indicates Mr. L. was observed for an extended time in the ER because the detox center was full.  T521.  Later, Mr. L. was found clinically sober and was discharged.  Id.

Mr. L. was seen at the Rapid City Regional Hospital on March 27, 2018, arriving via EMS for a witnessed seizure and left shoulder pain.  Id.  Mr. L. reported walking an hour earlier when he tripped and fell on his left side striking the left side of his head and left shoulder, and "went into a seizure." Id.  Mr. L. denied a history of alcohol abuse although records show that he is frequently intoxicated.  Id.  The treatment note stated his last alcohol use was the prior day, and blood tests confirmed his alcohol level was normal.  T521, 524.  Review of Systems was negative for neck pain, back pain, weakness, headaches, or any psychiatric/behavioral symptoms.  T522.  Examination revealed pain with range of motion of left shoulder although the remainder of the arm was fine, normal mood and affect, and tremulous.  T523.  Imaging revealed an acute left clavicle fracture, a small underlying skull fracture and small subdural hematoma, and degenerative disc changes most prominent at C5-6 but present also at C4-5 and C6-7.  T525-26, 531.  Mr. L. was admitted to the hospital.  T526.

Mr. L.'s assessment included alcohol withdrawal related seizure, in addition to his shoulder fracture and subdural hematoma. T532.  Mr. L. reported drinking vodka daily for the last month after he lost his partner due to cirrhosis.  T533.  He was preparing boxes to move and tripped down the stairs striking his head and shoulder and blacked out.  Id.  EMS reported witnessing a seizure.  Id.  Examination revealed normal range of motion and no CVA tenderness in the back; mild non-intention tremors in the bilateral extremities with tenderness to palpation in the left shoulder along clavicle; symmetric

pulses in all extremities; intact strength, sensation, and reflexes throughout. T535-36.  A later assessment while in the hospital stated it was unclear if this was an alcohol seizure, although Mr. L.'s drinking may have lowered his threshold.  T536.  Mr. L. was discharged on March 30, 2018, with a shoulder sling and was to follow up with orthopedics.  T541.

Mr. L. was seen at Rapid City-Indian Health Service ("IHS") on August 20, 2018, for suicidal ideation.  T385.  Mr. L.'s depression screening was positive.  T387.  Mr. L.'s pain assessment at screening was 0.  T390. Examination revealed no tenderness to palpation in the neck, clear lungs, normal abdomen, no focal neurological deficits, no tenderness in the musculoskeletal system, and no edema in the extremities.  T391.  Mr. L. was transferred to Rapid City Regional Hospital.  T472.

Mr. L. was seen at the Rapid City Regional Hospital on August 20, 2018, via transfer from IHS for suicidal ideation that had worsened the last several days.  T542.  Mr. L. reported the suicidal ideation had plagued him since January when his life partner died, and he had been self-medicating with alcohol.  Id.  Mr. L.'s Review of Systems was negative for any arthralgias, back pain, seizures, and self-injury, but was positive for sleep disturbances and suicidal ideation.  T543.  Examination revealed normal range of motion in the musculoskeletal system without any edema; proper orientation; and normal mood, affect, speech, behavior, judgment, but he expressed suicidal ideation and suicidal plans.  T544.  Mr. L. was admitted to the psychiatric facility. T545.

Mr. L. reported searching for a rope the prior night to hang himself. T546.  Mr. L. reported drinking for three months straight after his life partner died and felt he was trying to kill himself and had never felt depression like this.  Id.  Mr. L. denied any physical symptoms of injury or illness.  Id.  Mr. L. was prescribed sertraline for depression, lorazepam for anxiety, and medication to help him sleep.  T551.  Mr. L.'s mental status exam on discharge was normal except for depressed mood and affect congruent with mood.  Id.

Mr. L. was seen at the Rapid City Regional Hospital on September 3, 2018, after reporting to police he had a seizure.  T557.  Mr. L. was intoxicated, and the treatment note stated they suspected he did not have a seizure.  Id. The treatment note indicated that Mr. L. had a long history of alcohol intoxication and abuse.  T555.  It also noted that he has a history of a seizure disorder, and it was unclear whether his seizures were alcohol related/alcohol withdrawal related.  Id.  Mr. L. stated that he had not taken his medications because he lost them or did not know where they were stored.  Id. Examination revealed that Mr. L. was heavily intoxicated by alcohol; had normal range of motion in the musculoskeletal system with no edema, tenderness, or deformity; and exhibited normal muscle tone and no cranial nerve deficit.  T556.  Mr. L. was discharged to County Detox.  T558.

Mr. L. was seen at IHS on September 5, 2018, requesting Ativan and Zoloft.  T458.  He reported that he had been quite depressed but had improved with the use of Zoloft 50 mg daily.  Id.  Mr. L. had been seen at the hospital with a blood alcohol of 0.44 with no other remarkable pathology present.  Id.

11

He was transported to County Detox where he spent the night before coming to the clinic.  Id.  Clinically, Mr. L. appeared to be in alcohol withdrawal and did not feel homicidal or suicidal.  T458, 461.  Mr. L. had an obvious tremor in his upper extremities.  Id.  Ativan and Zoloft were prescribed.  T461.

Mr. L. was seen at the Rapid City Regional Hospital on September 7, 2018, brought in by law enforcement with reports of suicidal ideation and depression with a suicide attempt that was thwarted by friends.  T558.  Mr. L. reported being in the park and putting a rope around a tree to hang himself but was stopped by his friends who called law enforcement.  Id.  Mr. L. reported being out of medication the last 4-5 days and drinking heavily recently.  Id.  Mr. L. reported that drinking helped with the pain of his depression where his pills did not but admitted that drinking increased his suicidal thoughts.  Id.  Mr. L. admitted that he drank ½ a pint of vodka and reported being upset that his friends stopped him and that he would find way to hang himself as soon as he was able to leave the hospital.  T558-59.

Mr. L. was admitted to the psychiatric unit on a hold.  T562.  Mr. L. had pills in his possession that he had planned to take when no one was looking.  Id.  Mr. L. endorsed feeling persistently sad, disinterested, lacking pleasure, low motivation, diminished hope, and persistent suicidal thoughts.  Id.  Mr. L. voluntarily agreed to treatment after the mental health hold was dropped and denied any active intent or plan to harm or kill himself or anyone else.  Id.  Mr. L.'s problems were described as neurovegetative depression with anxious distress complicated by alcohol dependence, grief loss issues, and alcohol use

disorder.  T566.  Mr. L. was discharged on September 10, 2018, after his mental health hold was dropped.  T570.

Mr. L. was seen at IHS on September 22, 2018, with worsening depression, feeling suicidal, and thoughts of hanging himself.  T442.  He reported a plan of hanging himself with a rope from a tree down by the pond at the civic center since being released from County Detox that morning.  T445.  The treatment notes indicated he had been out of his anti-depression medication for two weeks.  T443.  Mr. L.'s parents and partner had died in the last year.  T445.  The treatment notes stated Mr. L. had three previous Behavioral Health hospitalizations for suicidal ideation with cut wrists and medication overdose.  Id.  Mr. L. was shaky and reported having only one alcohol drink the prior day.  T450.  Examination revealed that Mr. L. was properly oriented, had intact sensation, showed no bony tenderness or effusions, exhibited normal muscle strength and tone, had no upper or lower extremity edema, and no cyanosis.  T448.  Mr. L. was transferred to Rapid City Regional Hospital ER.  T451.

Mr. L. was transferred on September 22, 2018, to Rapid City Regional Hospital to be evaluated for thoughts of suicide and depression.  T574.  Mr. L. denied any current plan and reported being noncompliant with his medications.  Id.  Examination revealed normal mood and affect, normal speech, normal behavior, normal judgment, no active hallucinations, and intact cognition and memory.  T576.  Mr. L. was transferred to the crisis care center.  Id.  Mr. L. was transferred back to the Rapid City Regional Hospital on

13

September 23, 2018, for evaluation of needed medications.  T710.  Mr. L. was given Lorazepam and his other prescriptions were given and he was redirected back to the crisis center.  T712.

Mr. L. was seen at IHS on September 23, 2018, for anxiety following discharge from the hospital without his gabapentin, which he reported leaving in his niece's car who then left town for three weeks, and a refill was given.  T657.

Mr. L. was seen at the Rapid City Regional Hospital on September 24, 2018, brought in by law enforcement on a mental health hold due to suicidal ideation.  T580, 584.  Mr. L. was found outside a convenience store bleeding from the mouth and reported he had used a razor to cut the side of his mouth and neck to kill himself.  T580.  Examination revealed scratches of the anterior neck and an abrasion near his mouth, and he appeared mildly intoxicated. T582.  Mr. L.'s wounds were superficial and did not require treatment.  T584. He was kept in place because there were no beds available in the psychiatric unit and the mental health hold was dropped the next morning.  Id.

Mr. L. was seen at the Rapid City Regional Hospital on September 25, 2018, brought in by ambulance after he crawled out from under a bridge and notified authorities he was assaulted and struck in the right shoulder.  T590. He admitted that he was drinking alcohol.  Id.  Examination revealed mild tenderness to palpation in right upper chest wall, mild right upper back tenderness, and deformity of the right clavicle.  T591.  Mr. L. was alert and showed no focal deficits.  Id.  X-rays showed a fractured clavicle, but the acuity

14

of the injury was suspect as there was no abrasion or large amount of swelling. T592.  Mr. L. was given a sling, pain medication, and discharged.  Id.  Mr. L. remained in the ER waiting room waiting on transportation and checked back into the ER when his pain worsened.  T593.  Examination revealed right clavicle edema and tenderness and Mr. L. was given Norco and discharged.  T594.

Mr. L. was seen at IHS on September 29, 2018, for pain in his right shoulder due to a clavicle fracture.  T645.  Mr. L. had not taken any medications because he claims that he ran out.  T646.  Mr. L. also reported that he filled a prescription for Hydrocodone/APAP on September 25, 2018, but his medication was stolen, along with other belongings and his ID.  Id.  Tylenol #3 was prescribed for pain rather than Norco due to the clinic's policy on lost medication and no identification, and an orthopedic referral was made. T754, T655.

Mr. L. was seen at the Rapid City Regional Hospital on October 2, 2018, with continued right clavicle and shoulder pain.  T595.  Mr. L. reported decreased range of motion of the shoulder and was wearing his sling.  Id.  He had full range of motion in the right hand and right elbow.  Id.  Examination revealed no edema in the musculoskeletal system and normal mood and affect. T596-97.  Mr. L. reported he had tried unsuccessfully to get a referral from his primary care physician, so he went back to the Emergency Room ("ER") for pain management.  T597. He was given one Norco pill and told the ER he could

15

not manage his chronic condition and needed to get a referral for orthopedics.  Id.

Dr. Rooks contacted IHS on October 2, 2018 and informed the clinic that Mr. L. had become frustrated during a conversation with "PRC" and said, "I'll just go kill myself."  T644.  The clinic called the police.  Id.

Mr. L. was seen at IHS on October 4, 2018, to refill his medications, which he reported were in his backpack when it was stolen.  T640.  He was out of antidepressants, blood pressure, and pain medications.  Id.  Examination revealed Mr. L. was tired-appearing, disheveled, and wearing a right arm sling due to a clavicle fracture.  T642.  Mr. L. exhibited equal handgrip strength and could move all fingers without difficulty.  Id.

Mr. L. was seen at the Rapid City Regional Hospital on October 14, 2018, brought in by law enforcement on a hold after he threatened to kill himself in front of a clerk at a gas station, apparently holding a knife to his throat and saying he was going to kill himself.  T598.  The clerk contacted the police, and, in the meantime, Mr. L. turned over the knife and began to cry.  Id.  Physical examination was normal and revealed proper orientation and normal range of motion in the musculoskeletal system.  T599.  Mental examination revealed impaired cognition and memory, impulsivity, depressed mood, suicidal ideation, and suicidal plans.  T600.  Mr. L. was noncommunicative, smelled of alcohol, and admitted using alcohol.  Id.  Mr. L. was transferred to the psychiatric unit.  T603.

Mr. L. reported that due to the pain of his shoulder and his depression, he had a pint of vodka and went for a drive in Sturgis, which was where his life partner had lived.  T605.  When memories came back and he became depressed, Mr. L. grabbed a knife from a friend's kitchen, walked out and started cutting himself on his neck and chest.  Id.  Mr. L. reported loss of concentration, short term memory loss, low energy, feeling worthless, poor appetite, poor sleep, feeling guilty over his drinking, feeling depressed, and drinking to cope.  Id.  Mr. L. was treated in the psychiatric unit for 15 days with medication, group therapy, and other therapeutic activities, and discharged on October 29, 2018.  T612.  On October 29, 2018, Mr. L.'s mental status examination revealed a well-groomed appearance, no increase or decrease in psychomotor activity, appropriate eye contact, normal speech, good mood, congruent affect, linear and goal-directed thought process, no suicidal ideation, no hallucinations, normal memory, intact insight, appropriate judgment, and intact impulse control.  Id.  Mr. L.'s medications on discharge were Lipitor, Klonopin, gabapentin, hydrocodone, ibuprofen, Keppra, Zestril, Zantac, Zoloft, and thiamine.  T613-14.

Mr. L. was brought to the Rapid City Regional Hospital by the police on November 15, 2018, for depression and suicidal thoughts and was intoxicated. T747.  Examination revealed labile affect, rapid and pressured speech, impulsivity, depressed mood, and suicidal ideation with plans.  T749.  Mr. L. was admitted to the psychiatric unit where he reported that he started drinking and planned to hang himself after someone called him a "black widow" because

his life partner had died.  T751-52.  Mr. L.'s diagnoses included major depression, recurrent, severe without psychotic features; alcohol use disorder; complicated grief; history of seizure disorder and possible alcohol withdrawal seizures; and rule-out substance-induced mood disorder.  T756.

Mr. L. was admitted for inpatient treatment with an estimated treatment of 3-5 days but received inpatient treatment until discharge on December 10, 2018.  Id.  Mr. L.'s mood rapidly improved while in the psychiatric unit and receiving group and other therapy.  T757.  Mr. L. was prescribed Seroquel, Klonopin, and Zoloft, and the goal throughout his hospitalization was to get a bed at the state Human Services Center ("HSC") for continued treatment. T758.  Mr. L. obtained a bed at HSC and was discharged for continued treatment there for mental health and substance abuse.  Id.

Mr. L. was seen at the Rapid City Regional Hospital on January 13, 2019, for ongoing suicidal ideations, depression, and complicated grief.  T762. Mr. L. reported it was coming up on the one-year anniversary of the death of his life partner.  He started drinking on Friday and was wandering in traffic, hoping to be hit by a car.  Id.  Friends called the police, and he was taken to detox.  Id.  He was now sober but stated he continued to have suicidal ideations, wanted to die, and had significant depression.  Id.  Mr. L. had been off Zoloft for at least a week.  Id.  Mr. L. reported that he thought he had a seizure while in detox.  He did not think simply restarting his medications would be sufficient and was requesting inpatient psychiatric treatment.  Id.

18

Review of systems was negative for any weakness, headaches, back pain, myalgia, or neck pain.  T763.  Physical examination exhibited normal range of motion in the neck and musculoskeletal system; showed no tenderness, edema, or deformity in the musculoskeletal system; oriented to person, place, and time; normal muscle tone; and no nerve deficits.  T764.  Mental examination revealed that Mr. L. endorsed suicidal ideation and suicidal plan, but had normal behavior, normal judgment, anxious mood, labile affect, rapid/pressured speech, normal memory, and normal cognition.  Id.  Mr. L. was admitted for inpatient psychiatric care and remained inpatient until being discharged on January 21, 2019.  T773.

The treatment record stated that Mr. L. had received treatment for two weeks in Yankton, South Dakota,[4] after his last psychiatric inpatient treatment and then had tried to live a "normal" life for 2-3 months in Sioux Falls.  T768.  Mr. L. had been prescribed Sertraline and Trazadone during that time.  Id.

Mr. L. attended a gathering for the anniversary of the death of his friend, which caused him to drink after being sober for a while.  Id.  Mr. L. began to feel suicidal and went to crisis care.  Id.  While being interviewed he was witnessed having a seizure that looked like a staring spell.  Id.  Mr. L.'s mood improved rapidly while in inpatient care.  T774.  Mr. L. was discharged with plans to return to Sioux Falls, where he did not have the memories that usually caused him to start drinking.  T775.  Mr. L. planned on staying at the Mission

---

[4] HSC is in Yankton, South Dakota.  There are no treatment records from HSC in the appeal record.

in Sioux Falls where he would likely receive care at Southeastern Behavioral Health.  Id.

Mr. L. was seen at Southeastern Behavioral Healthcare ("SEBH") on February 14, 2019, for his initial screening after referral to SEBH by Regional West in Rapid City.  T903.  Mr. L. reported being homeless since April 2018. Id.  Mr. L. had prescriptions for his medications and was planning on going to IHS in Flandreau to get assistance getting them filled.  Id.  Mr. L. scheduled a follow up appointment on February 20, 2019, for case management.  Id.

On February 20, 2019, Mr. L. did not show up for his scheduled appointment at SEBH.  T902.  A case worker attempted to contact Mr. L. to reschedule.  Id.

Mr. L. was seen at SEBH on February 25, 2019 and reported running out of his clonazepam and Wellbutrin and his anxiety was very high.  T901.  Mr. L. stated he had been trying to get set up with "UIH" [IHS] to get assistance going to Flandreau to get medications filled.  Id.

Mr. L. was seen at Falls Community Health on March 12, 2019, to establish care and complained of depression, seizures, anxiety, high blood pressure, and a history of broken shoulders on both sides that still bother him with chronic pain.  T830.  Mr. L. said he thought he had health coverage through IHS but did not know how he could get them to pay for his medications in Sioux Falls.  Id.  Mr. L. had been started on Wellbutrin, which he was not a good candidate for with his seizure disorder.  Id.  Mr. L. reported being sober for five months except for a recent episode of drinking.  Id.

20

Examination revealed no tenderness in the shoulders to light touch, but tenderness when palpating for pain, painful arc of pain with both arms, a visible deformity of the right shoulder due to a prior clavicle fracture, and no apparent loss of motion or weakness.  T831.

Mr. L. had a PHQ-9 score of 22,[5] indicating severe depression. T832. Mr. L. was not believed to be a good candidate for narcotic use for his chronic shoulder pain.  Aspercreme was recommended and physical therapy when able to get insurance, and his Wellbutrin was discontinued.  T831.  Mr. L. became irritable when he was declined narcotic medication and Wellbutrin and was not present in the room when later checked on.  Id.

Mr. L. was seen at Avera McKennan ER on April 3, 2019, brought in by the police on a mental hold for attempted suicide by medication overdose. T1196.  Mr. L. reported being stressed since his partner died.  Id.  Mr. L. had been on Zoloft, Keppra, gabapentin, Wellbutrin, and Klonopin while in the hospital, but was unable to afford them and discontinued them.  T1201. Mr. L.'s Wellbutrin and clonazepam had been discontinued by a doctor at Falls Community Health and Mr. L.'s mood became more depressed.  T1196.  Mr. L. reported he had been depressed and had suicidal thoughts all his life, and his

---

[5] PHQ-9 is a self-administered patient questionnaire that has been shown to be valid for making criteria-based diagnoses of depressive disorders, and a reliable and valid measure of depression severity.  See https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC1495268/ (last checked April 25, 2022).  PHQ-9 scores range from 0 to 27 with a score of 10-14 indicating moderate depression, 15-19 moderately severe depression, and 20 and above indicating severe depression. See https://www.pcpcc.org /sites/ default/files/resources/instructions.pdf at page 7 (last checked April 25, 2022).

depression got worse as he got older.  Id.  Mr. L. said there is not a day that goes by that he does not have suicidal thoughts, but not always with intent or a plan.  Id.  Mr. L. reported the depression felt a little better than the prior day because he felt safe and had someone to talk to at the hospital.  Id.  Mr. L. reported decreased sleep, decreased appetite, anhedonia, hopelessness, low energy, and increased anxiety.  Id.

Mental status examination revealed cooperative attitude, good eye contact, depressed mood with congruent affect, linear and circumstantial thought process, chronic suicidal thoughts that had decreased from the prior day, no homicidal thoughts, no paranoia or hallucinations, clear sensorium, proper orientation, and limited insight and judgment.  T1198.  Mr. L. was admitted for treatment and his mood improved and he was no longer suicidal. T1199.  He was discharged on April 9, 2019.  Id.

Mr. L. was seen at Avera McKennan ER on April 9, 2019, complaining of a seizure.  T1173.  Mr. L. had been at the Banquet when he had a witnessed seizure.  Id.  Witnesses said his face started twitching and he became unresponsive; witnesses reported that the twitching lasted about 10 minutes. Id.  Mr. L. reported that he had been taking his Keppra, although he was unaware of where his Keppra pills were located.  T1173, 1175.  Mr. L. was intoxicated, so an alcohol withdrawal seizure was thought unlikely.  T1175. Examination revealed no joint swelling, normal muscle tone, intact sensation, appropriate behavior, and appropriate judgment.  T1174.  Mr. L. was told to

22

follow-up with his neurologist for Keppra dosing and he was sent back to the Banquet. T1175.

Mr. L. was seen at Avera McKennan ER on April 10, 2019, complaining of a seizure. T1163. Mr. L. reported he believed he had a seizure the day before and another that day and had not taken his Keppra in the last day or two. T1153. He admitted drinking alcohol. T1163. Examination revealed full range of motion in all extremities and a calm psychiatric appearance. T1164. Mr. L. was discharged to detox. T1166.

Mr. L. was admitted at Avera McKennan ER on May 4, 2019, and discharged on May 6, 2019, for a suicide attempt by medication overdose while under the influence of alcohol. T1131, 1138. Mr. L. reported he had lost his job at a local food company and was feeling overwhelmed leading to the suicide attempt. T1131. Mr. L. reported he had struggled with intrusive thoughts of self-harm since the death of his partner. Id. Mr. L. was also asking for hydrocodone for chronic arm pain. Id. Mr. L. reported he had been sober for around three weeks before drinking one half pint of vodka the day of his overdose. Id.

Psychiatric Specialty Examination revealed calm behavior, normal psychomotor activity, normal mood, congruent affect, intact associations, goal-directed thought processes, thought content with passive suicidal ideation but no active suicidal ideation, proper orientation, intact memory and concentration, intact remote and recent memory, and poor insight and judgment. T1132. Mr. L. was transferred to Avera Behavioral Health and

treated until being discharged on May 7, 2019.  T1128.

Mr. L. had an appointment at SEBH on May 7, 2019 but did not show up.  T900.  The progress note stated a call was received from Avera Behavioral Health that Mr. L. was being held after an overdose attempt.  Id.  An appointment with a SEBH caseworker was scheduled on May 13, 2019.  Id.  On May 13, 2019, Mr. L. again did not show for his scheduled appointment.  T899.

Mr. L. was seen at Avera McKennan ER on May 22, 2019, for a suicide attempt by gabapentin overdose while under the influence of alcohol.  T1104.  The police had been called to the Mission and found Mr. L. attempting to harm himself with a butter knife while intoxicated, screaming that he wanted to "funking die," and endorsing overdosing an unknown amount of gabapentin.  Id.  Mr. L. reported he wanted to die because his significant other was no longer with him, and he really missed him.  Id.  The discharge summary stated Mr. L. continued to struggle with depressive symptoms since the death of his long-term partner and had recently gone back to Rapid City over Mother's Day, but Mr. L. reported significant discord ensued that added to his depression.  T1093.  Mr. L. reported he had been drinking approximately two times per week, consuming a pint of vodka each time.  T1095.  Mr. L. was involuntarily admitted and was transferred to Avera Behavioral Health and treated until May 26, 2019, when he was discharged to detox after a 5-day hold.  T1093-94, 1107.

Mr. L. was seen at Avera McKennan ER on May 27, 2019, for a suicide

24

attempt by medication overdose while under the influence of alcohol.  T1064.
Mr. L. was discharged on May 29, 2019, to Yankton HSC.[6]  T1060.

On June 6, 2019, Mr. L. did not show up for his appointment at SEBH.
T898.  The appointment was scheduled by HSC following his release.  Id.

Mr. L. was seen at Avera McKennan ER on June 14, 2019, after an
intentional overdose of medication.  T1029.  Mr. L. reported getting in a verbal
altercation with his brother the prior day and feeling overwhelmed with
depressive symptoms of hopelessness and helplessness.  Id.  He decided to take
extra medication to catch up with missed doses, and his depression had
worsened recently so he took the extra medication to help.  T1029, 1034.
Mr. L. reported some episodic anxiety that he self-medicated with alcohol.
T1029.  He denied any suicidal ideation, homicidal ideation, hallucinations, or
any intent to self-harm.  T1029-30.

Psychiatric examination revealed calm appearance, neutral mood, goal-
directed thought process, intact association, coherent speech, intact sensorium
and orientation, intact attention and concentration, intact memory, appropriate
fund of knowledge, and poor insight and judgment.  T1030-31.  Mr. L. stated
that his depression stemmed significantly from the loss of his partner in
January 2018, that he thinks about suicide daily, although his degree of action
varies, and if he were to commit suicide he would overdose on pills or go into
the woods and hang himself.  T1034.  Mr. L.'s assessments were polysubstance
overdose, alcohol abuse, depression, and other chronic medical concerns.  Id.

---

[6] Again, no treatment records from HSC are present in the appeal record.

Mr. L. was discharged on June 16, 2019, with arrangements made for transfer to HSC for ongoing psychiatric care.[7]  T1035.

On June 26, 2016, Mr. L. went to SEBH for his scheduled appointment for case management.  T897.  He apologized for missing so many of his appointments and noted he was out of medication.  Id.

Mr. L. was seen at Avera McKennan ER on June 28, 2019, for a suicide attempt by medication overdose while under the influence of alcohol.  T992.  The treatment notes stated this was Mr. L.'s seventh time he had been hospitalized for alcohol intoxication and subsequent drug overdose since April 3, 2019.  Id.  Mr. L. reported he continued to be stressed by the loss of his partner, homelessness, unemployment, and ongoing substance abuse.  Id.  Mr. L. was on an involuntary hold.  Id.  Mr. L. reported continued symptoms of depression, sadness, grief for his partner, and hopelessness.  T992-93.

Mental status examination revealed a somewhat unkempt appearance but calm and cooperative demeanor; clear speech; neutral mood; congruent affect, logical and linear thought process; no endorsement of any suicidal or homicidal ideation, plan, or intent; intact remote and recent memory; good attention and concentration; and poor to limited insight and judgment.  T993-94.  Physical examination revealed normal range of motion, gait, and station with no evidence of muscular atrophy.  T994.  Mr. L. was transferred to Avera Behavioral Health.  T991.  Mr. L. was discharged on July 2, 2019, once

---

[7] Again, no treatment records from HSC are present in the appeal record.

the hold was lifted.  T1005.  Mr. L.'s gabapentin was restarted, and social work was to investigate access to medications for Mr. L.  Id.

Mr. L. was seen at SEBH on July 3, 2019 and reported he had been hospitalized at Avera Behavioral Health from Saturday through Thursday after he went to see his sister-in-law.  T896.  She was not doing well, and he felt depressed after seeing her and started drinking, and then took all his medications.  Id.  While hospitalized, they stopped his sertraline, hydroxyzine, and Keppra, and prescribed two new psych medications, continued gabapentin for pain, and started Depakote.  Id.

On July 10, 2019, Mr. L. canceled his appointment at SEBH because he was given a day job of helping someone move.  T895.  He rescheduled his appointment for the next day.  Id.

Mr. L. was seen at SEBH on July 11, 2019, and reported he had not been taking his Depakote because Falls Community Health was requiring him to complete blood work before it would prescribe.  T894.  He had been waiting during walk-in hours at Falls Community Health but had not been seen.  Id.  He also reported being off his medications due to lack of funding.  Id.  The caseworker was able to get him an appointment for that day.  Id.  Mental status examination from July 11, 2019, revealed proper orientation, well-groomed appearance, good eye contact, normal speech, sad mood with congruent affect, intact memory and concentration, fair insight and judgment, coherent thought processes, and normal thought content with no current suicidal or homicidal ideations.  T908.

27

Mr. L. was seen at SEBH on July 24, 2019, and reported that things were going well.  T891.  He had plans to go to Pine Ridge and then was going to work at the Sturgis Rally.  Id.

Mr. L. was seen at SEBH on August 21, 2019, and reported he had been terminated from a job in Sturgis for stealing a bottle of whiskey, which he denied.  T888.

Mr. L. was seen at Avera McKennan ER on August 21, 2019, complaining of a 10-minute seizure.  T981.  Mr. L. reported he has been somewhat more down over the last several days as his anniversary was on the 14th and he lost his partner last year.  Id.  Mr. L. had missed several doses of his seizure medication, was intoxicated, and was sent to detox.  T981, 983.

Mr. L. was seen at Avera McKennan ER on August 27, 2019, complaining of right-sided chest pain after a bicycle accident.  T973.  X-rays revealed a rib fracture.  T974.

Mr. L. was seen at SEBH on September 3, 2019, and reported going to the ER due to cracked ribs when he fell off his bike.  T886-87.  He noted that he was doing much better today than last week.  T886.  He stated that he was given one week of medication after cracking his rib and that the medications were working well with no issues.  Id.

Mr. L. was seen at Avera McKennan ER on September 9, 2019, complaining of a possible seizure.  T962.  He was unresponsive for 2 to 6 minutes and only remembers whistling at his nephew who was driving by, and then paramedics were around him.  Id.  Mr. L. reported being off his

28

antiepileptics for about a week.  Id.  Physical examination revealed no obvious musculoskeletal abnormalities and normal affect.  T963.

Mr. L. was seen at SEBH on September 10, 2019, and reported being off his medications two days and having a seizure the prior day that he believed was because he did not have his medications.  T885.

Mr. L. was seen at SEBH on September 17, 2019.  T884.  He stated his medications were working well and he had no complaints.  Id.  He admitted he had been in and out of jail due to alcohol.  Id.

Mr. L. missed an appointment at SEBH on September 19, 2019, and the SEBH record stated Mr. L. was incarcerated at the Minnehaha County Jail.  T883.

On November 21, 2019, Mr. L. was seen at SEBH.  T904.  Mr. L. reported taking Keppra for seizures but was discontinued because of the effect it had on his mood and aggressiveness.  T905.  He was switched to Depakote but did not like it because of its association with weight gain and liver disease.  Id.  Mr. L. reported continued anxiety in social situations, but no suicidal ideations.  Id.  Mr. L.'s mental status exam revealed anxious mood, affect congruent with mood, fair concentration, insight, and judgment; good eye contact; normal non-pressured speech; normal psychomotor activity; no aggressive behavior; intact memory; average intelligence; coherent and logical thought process; and thought content with no current suicidal ideation, homicidal ideation, hallucinations, or delusion.  Id.

Mr. L.'s assessments included Bipolar II disorder, currently depressed, social anxiety disorder, unresolved grief, seizure disorder, medication noncompliance, and alcohol use disorder, in remission.  Id.  Mr. L.'s Trileptal dosage was increased to help with mood stabilization and partially with seizure disorder.  Id.

Mr. L. was seen at SEBH on November 25, 2019, and was given a week's supply of medication, which included medication changes ordered by Mr. L.'s doctor, who he had seen the week prior.  T870.  Mr. L. was noted to be very shaky throughout the appointment.  Id.

Mr. L. was seen at Avera McKennan ER on November 27, 2019, complaining of a possible seizure, and not wanting to be alone.  T954.  Mr. L. reported feeling sad since this was the one-year anniversary of his partner's death, and he did not feel safe at home because he feels lonely and resorts to alcohol.  Id.  Mr. L. admitted to alcohol use and said he may have had a seizure and EMS was called after he burned his food.  Id.  Examination revealed flat mood and affect.  T955.  Mr. L. could move all his extremities without pain and had no neurological deficits.  Id.  Alcohol intoxication was suspected as the cause of the time lapse and burning of his food, and Mr. L. was placed on a detox hold.  Id.

On December 12, 2019, and December 18, 2019, Mr. L. was a no-show for his appointments at SEBH.  T848-49.  Mr. L. phoned SEBH on January 8, 2020, and cancelled an appointment because he was on the way to the hospital.  T847.

On January 15, 2020, Mr. L. was a no-show for his scheduled appointment at SEBH.  T863.

Mr. L. was seen at SEBH on January 16, 2020, and reported having a seizure the prior day.  T862.  He also reported that things were going okay and that he would be moving the refrigerator in his apartment to another wall.  Id.

On January 23, 2020, Mr. L. did not come in at his scheduled time for medication and case management at SEBH.  T859.

Mr. L. was seen at SEBH on January 28, 2020, and was given a week's supply of medication.  T858.  Mr. L. reported his medications were working well and that his living situation was good.  Id.  Mr. L. was noted to be very shaky throughout the appointment with good mood and hygiene.  Id.

Mr. L. was seen at Avera McKennan Hospital on February 3, 2020, for a laceration to his right hand that occurred when playing a knife game while drinking with a friend.  T943-44.

Mr. L. was seen at SEBH on February 4, 2020, and his hand was bandaged.  T857.  He reported having been to Avera, where he received stiches.  T857.  He further stated everything else was going well, but he did appear very tired.  Id.

Mr. L. was seen at SEBH on February 12, 2020, and reported he had just been discharged from the ER due to cutting his hand while doing dishes.  T856.  Mr. L. was given one week's supply of medications.  Id.

Mr. L. was seen at Avera McKennan Hospital on February 14, 2020, complaining of a possible broken left arm after falling on some ice.  T937-38.

31

Examination of the left arm was normal aside from mild pain over the left forearm.  T939.  X-rays revealed a fracture of the distal third of the shaft of the left ulna, and pain medication, a sling, and an orthopedic referral were given.  Id.

Mr. L. was seen at SEBH on February 19, 2020, and his arm was in a sling.  T855.  He reported having broken his arm when he fell on the ice and was to be seen at the Orthopedic Institute next week.  Id.

Mr. L. was seen at Avera McKennan Hospital on February 23, 2020, for a cut on his right middle finger that had gotten red and swollen and was treated with Keflex and Bactrim.  T928, 930.

Mr. L. was seen at Avera Orthopedics on February 24, 2020, for a left distal ulnar shaft fracture.  T917.  The treatment note stated he slipped in the bathtub causing the injury on February 14, 2020.  Id.  Mr. L. also reported swelling and pain in his right hand from a different incident unrelated to the fall that caused the left ulnar fracture.  T919.  Examination of the left upper extremity revealed no swelling, deformities, or tenderness except for moderate tenderness in the left mid forearm.  Id.  Also, the examination revealed full range of motion in the shoulder, intact muscle strength, and no motor or sensory deficit.  Id.  Examination of the right upper extremity revealed limited range of motion in the third and fifth fingers and an abscess over the right middle finger.  Id.  Incision and drainage of an abscess over the right 3rd PIP was planned.  Id.  Mr. L.'s left arm was transitioned to a cast.  T920.

Mr. L. was seen at Avera McKennan Hospital on February 24, 2020, for incision and drainage of the abscess on his right middle finger.  T922.

A Falls Community Health telephone encounter from February 27, 2020, stated that Falls Community Health had received notification that Mr. L. had been seen at Avera four times in the past 30 days in orthopedics and the emergency room and had procedures related to wounds, fracture, and infection in the right hand and fingers.  T835.

Mr. L. was seen at Avera McKennan Hospital on March 18, 2020, for an MRI of his hand almost one month post-incision.  T914-15.  Also, a drainage procedure was conducted that revealed diffuse subcutaneous edema surrounding the 3rd finger, which was more than expected and concerning for persistent cellulitis; abnormal marrow signal concerning for osteomyelitis; and no drainable 3rd PIP joint effusion was identified.  Id.  It was also found that the Septic 3rd PIP joint, however, could not be excluded given the adjacent marrow signal changes.  Id.

**D.     State Agency Assessments**

The State agency medical consultant at the initial level reviewed the file on October 22, 2018, and concluded there was insufficient evidence in the subject section of the medical evaluation.  T80.  The consultant found non-severe osteoarthritis and allied disorders, and never completed an RFC.  Id. The consultant's report stated, "There is insufficient evidence to evaluate the claim" but also stated a CE exam was not required.  T79, 81.

The State agency medical consultant at the reconsideration level reviewed the file on March 18, 2019, and concluded Mr. L. had severe epilepsy, severe COPD, and non-severe diseases of the Esophagus.  T89.  The consultant concluded Mr. L. had no exertional limitations and was limited to occasionally climbing ladders/ropes/scaffolds, and should avoid even moderate exposure to fumes, odors, dusts, and gases, as well as hazards.  T93.  The consultant noted Mr. L.'s right clavicle fracture and projected it would heal by the projected RFC date of September 25, 2019.  T92-93.

The State agency psychological consultant at the initial level reviewed the file on October 23, 2018, and concluded there was insufficient evidence to substantiate the presence of a depressive disorder, but also found that Mr. L. had a non-severe depressive disorder.  T80-81.  The consultant did not complete a mental RFC.  T80.  The consultant's report stated, "There is insufficient evidence to evaluate the claim" but also stated a CE exam was not required.  T79, 81.

The State agency psychological consultant at the reconsideration level reviewed the file on March 23, 2019, and concluded Mr. L. had severe depressive, bipolar, and related disorders, and severe substance addiction disorder (alcohol).  T89.  The consultant found that Mr. L. had mild limits in understanding, remembering, or applying information, mild limits in interacting with others, moderate limits in concentration, persistence, or maintaining pace, and mild limits in adapting or managing oneself.  T90.  The consultant stated, ". . . the claimant is disabled considering all impairments

34

including the DAA." Id.  The consultant stated, "Separating the mental restrictions of DAA from the mental restrictions of Major Depressive Disorder are reported in the following PRTF/MRFC." Id.

The consultant recited or summarized some of the medical evidence present in the file at the time of review, noting improved or good mental status exams at the time of various discharges from inpatient psychiatric treatment, and noted that it "appears [Mr. L.] was sober for approximately 2 months from mid-November to mid-January 2019 but he was hospitalized much of that time." T90-91.  The consultant then stated Mr. L. had marked limits in understanding, remembering, or applying information, mild limits in interacting with others, marked limits in concentration, persistence, or maintaining pace, and marked limits in adapting or managing oneself, and DAA is material and the claimant is disabled considering all impairments.  T91.

The consultant then stated a second PRTF was completed, which separates mental restrictions of DAA from mental restrictions of Major Depressive Disorder.  Id.  The consultant found that Mr. L. had moderate limits in his ability to maintain concentration, complete a normal workday without interruptions from psychological-based symptoms and perform at a consistent pace, and to respond appropriately to change.  T95.  The consultant asserted that Mr. L. had vegetative symptoms that impair functioning when drinking and when sober MER indicates that he has some ongoing depressive and anxiety symptoms that would likely lead to intermittent problems with concentration and pace.  Id.

35

**E.**   **Mr. L.'s Testimony at the ALJ Hearing**

Mr. L.'s hearing was held strictly by telephone due to Covid-19.  T36.
The medical records admitted at the time of the hearing were exhibits 1F-11F.
T38.

The ALJ noted there were no records in the file from Avera or Avera
Behavioral Health at the time of the hearing.  T52-53.

Mr. L. testified that before he obtained housing through SEBH and
"Housing" he had been homeless almost a year, or maybe six or seven months,
because he was going between the Mission and the Dudley.  T46.

Mr. L. testified that he gets mad and frustrated easily and tries to keep
calm but sometimes cannot.  T44.  Mr. L. said when he gets frustrated, he does
not lash out or try to hit anybody and never tries to take it out on somebody
else "because it's my demon that I have to deal with."  T45.  Mr. L. said he just
needs to be by himself and calm down, but sometimes it gets to the point
where he gets frustrated and cries.  T47.

Mr. L. testified that he thinks a lot about the death of his partner who
died in January 2018.  T48.  Mr. L. testified that when he thinks about his
partner, the depression hits because they were together for ten years, and he
was Mr. L.'s rock.  Id.  Mr. L. testified he gets depressed and two or three times
per week he just wants to stay away from everybody, stay in his apartment, not
go anywhere, and not talk to anybody.  T49.

Mr. L. testified that he had attempted suicide quite a few times.  T50.  He
said it started when he was young but hit its peak when his partner died.  Id.

36

Mr. L. said he thought the last time was at the end of the summer and since then he has some friends and a nephew that come around to check on him. T51.  If he is depressed, his friends and nephew will take him for a drive to help keep him stable.  Id.  Mr. L. testified that his friends make sure he eats, cleans himself, brushes his teeth, and help him maintain and clean his apartment.  T60.

Mr. L. was asked if he felt he could "manage doing -- keeping a routine for at least a week" and he said sometimes he could, and then sometimes, when it gets too bad, he does not want to get out of bed or leave his apartment. T53.  Mr. L. then said he believed he could keep a routine for a week, get out of the house every day and maintain a schedule out of the apartment at a place of employment with the help of his friends, because sometimes he did not want to go back to his apartment because of the depression and anxiety.  T53-54.

Mr. L. testified that he was not sure he would be able to read a newspaper article and then talk about what he had read, because he said there are times when he watches movies and does not even know what they are about.  T54.

When asked if thoughts about suicide contributed to a bad fall Mr. L. had which led to a fractured skull and clavicle in March 2018, Mr. L. testified "I think that has contributed a lot to it."  T56.

During the ALJ's questioning of Mr. L. about some of his suicide attempts, Mr. L. testified that he still gets suicidal thoughts occasionally, and said, "After that last one, I think it was, when they shipped [me] down to

37

Yankton." T58.  The ALJ did not ask Mr. L. about being shipped to Yankton.  Id.

Mr. L. testified he had cut back quite a bit on alcohol and was only drinking two or three times per month and not getting "super drunk anymore." Id.

**F.      Psychologist Testimony**

The psychologist testified he studied the file and heard the hearing testimony, but he did not identify what portions of the file were given to him for review.  T64.  The psychologist testified that he had not seen any records from Avera.  T67.

The psychologist testified that not considering substance abuse or seizure disorder, he did not believe Mr. L. met any Listing, and he felt Mr. L. had no limits in understanding, remembering, or applying information, moderate limits in interacting with others, mild limits in concentration, persistence, or maintaining pace, and moderate limits in adapting or managing oneself.  T64-65.

The psychologist testified that if he did consider substance abuse, the only change would be a marked limitation in managing oneself.  T66.

The psychologist testified he was not able to provide an opinion on the effect the seizure activity had on Mr. L.'s functioning.  Id.

The psychologist was asked, based on his review of the records, consideration of the testimony, his expertise, experience, and training for his

opinion as to Mr. L.'s mental limitation or "B Criteria" with and without continued substance abuse.

## G.  Vocational Expert's Testimony

The vocational expert ("VE") identified occupations in response to hypothetical questions[8] by the ALJ and provided the number of jobs available nationally for each occupation.  T71.

The VE testified that the maximum threshold an employer would allow for employee ongoing absences was one day per month, especially for unskilled jobs.  T72.  The VE testified that the hypotheticals given by the ALJ would limit an individual to only unskilled work.  T71.

## DISCUSSION

## A.  Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).  "[S]ubstantial evidence has been defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' "  Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938))).  "Substantial

---

[8] The full hypothetical question discussion can be viewed at T69-71.

evidence is less than a preponderance . . . ." Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). "This 'review is more than a search of the record for evidence supporting the [Commissioner's] findings,' Hunt v. Massanari, 250 F.3d 622, 623 (8th Cir. 2001) . . ., and 'requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action.' " Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (quoting Cooper v. Sullivan, 919 F.2d 1317, 1320 (8th Cir. 1990)).

"In assessing the substantiality of the evidence, [the court] must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993) (citing Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)). The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Id. (quoting Locher, 968 F.2d at 727 (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984))); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

"[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision." Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson, 956 F.2d at 838). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citing Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998)).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (citation omitted).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  Id. (quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011)).  "Erroneous interpretations of law will be reversed."  Walker, 141 F.3d at 853 (citing Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997)).

The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Where "[s]everal errors and uncertainties in the opinion [occur], that individually might not warrant remand, in combination create sufficient doubt about the ALJ's rationale for denying" benefits, remand for further proceedings before the agency is warranted.  Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

## B.   The Disability Determination and the Five-Step Procedure

Social Security disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  Barnhart v. Walton, 535 U.S. 212, 214 (2002); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905.  "Section 423(d)(2)(A)," and its Title XVI analogue, 42 U.S.C. § 1382c(a)(3)(B), "restrict[] eligibility for disability benefits to claimants whose medically severe impairments prevent them from doing

41

their previous work *and* also prevent them from doing any other substantial gainful work in the national economy." Bowen v. Yuckert, 482 U.S. 137, 148 (1987); 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.909-416.911.

The ALJ applies a "sequential five-step procedure for determining whether a claimant is disabled." Smith, 987 F.2d at 1373. This sequential analysis is mandatory for all SSI applications. 20 C.F.R. § 416.920. The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If the applicant is engaged in substantial gainful activity, he is not disabled, and the inquiry ends at this step. Id. at § 416.920(b).

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(a)(4)(ii). If there is no such impairment or combination of impairments the applicant is not disabled, and the inquiry ends at this step. Id. NOTE: "[t]he regulations prescribe a special procedure for analyzing mental impairments" to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.920a. This special procedure includes completion of a "Psychiatric Review Technique Form" (PRTF). Browning, 958 F.2d at 820; 20 C.F.R. § 416.920a(d).

> **Step Three:** Determine whether any of the severe impairments identified in step two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 416.920(a)(4)(iii). If an impairment meets or equals a Listing, the applicant "will be considered disabled without further inquiry." Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985) (quoting Heckler v. Campbell, 461 U.S. 458, 460 (1983)). This is because "[t]he regulations recognize [the 'Listed' impairments] are so severe that they prevent a person from pursuing any gainful work." Heckler, 461 U.S. at 460; 20 C.F.R. § 416.920(d). "If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five." Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). NOTE: The "special procedure" for mental

impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 416.920a.

**Step Four:** Determine whether the applicant can perform past relevant work (PRW).  20 C.F.R. § 416.920(a)(4)(iv).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC).  See Reed, 399 F.3d at 922 ("The ALJ must determine a claimant's RFC based on all of the relevant evidence.") (quotation omitted).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv); 416.945.  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to step five.  20 C.F.R. § 416.945(a)(5)(ii).

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. 20 C.F.R. § 416.920(a)(4)(v); See Morse v. Shalala, 32 F.3d 1228, 1229 n.2 (8th Cir. 1994) (per curiam) (citation omitted).  To determine if the applicant can adjust to other work, the ALJ considers their RFC, age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v).

## C.    Burden of Proof

"The plaintiff bears the burden of proof at steps one through four of the five-step inquiry."  Webb v. Berryhill, 294 F. Supp. 3d 824, 873 (D.S.D. 2018) (citing Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994)); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 416.912.  The "burden of proof shifts to the Commissioner at step five."  Mittlestedt, 204 F.3d at 852 (citing Wilcutts, 143 F.3d at 1137); Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) ("[T]he burden of proof shifts to the Commissioner to prove, first that the claimant retains the [RFC] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do.") (citations omitted).  "This shifting of the burden of proof to the

Commissioner is neither statutory nor regulatory;" it "is a long-standing judicial gloss on the Social Security Act." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999); Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987) superseded by statute as stated in Mandella v. Astrue, 820 F. Supp. 2d 911 (E.D. Wis. 2011).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) (citing Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004)).

**D.     The Parties' Positions**

Mr. L. asserts the Commissioner erred in four ways: (1) "[t]he Commissioner failed to properly evaluate [Mr. L.'s] alcohol abuse impairment;" (2) "[t]he Commissioner failed to fully and fairly develop the record;" (3) "[t]he Commissioner failed to identify all of [Mr. L.'s] impairments at Step 2 and include resulting limitations in his RFC;" and (4) "[t]he Commissioner failed to carry her burden at Step 5 to identify jobs [Mr. L.] could perform based on substantial evidence." See Docket No. 18.

The Commissioner asserts: (1) "[t]he ALJ properly considered [Mr. L.'s] substance abuse in [the] disability determination;" (2) "[t]he ALJ fully and fairly developed the record;" (3) "[t]he ALJ made a proper Step Two determination;" and (4) "[t]he ALJ carried the Commissioner's Step Five burden by producing evidence of a significant number of jobs in the national economy that [Mr. L.] could perform." See Docket No. 20.

44

**E.     Analysis**

   **1.     Whether the Commissioner Properly Evaluated Mr. L.'s Alcohol
          Abuse Impairment**

Mr. L.'s first assignment of error is that "[t]he Commissioner failed to

properly evaluate" Mr. L.'s Drug and Alcohol Addiction ("DAA") by: (1) failing to

point to evidence that establishes Mr. L. would not be disabled absent his DAA

impairment and (2) failing to mention and follow the standards imposed by

SSR 13-2p.  Docket No. 18, pp. 2, 6.

   **a.     Standards for Drug and Alcohol Addiction**

"Section 423(d)(2)(C) [and 42 U.S.C. § 1382c(a)(3)(J)] provide[] that an

individual shall not be considered disabled for Social Security purposes 'if

alcoholism or drug addiction would . . . be a contributing factor material to the

Commissioner's determination that the individual is disabled." Rehder v. Apfel,

205 F.3d 1056, 1059-60, 1059 n.3 (8th Cir. 2000) (quoting 42 U.S.C.

§ 423(d)(2)(C)).  "The key factor . . . in determining whether drug addiction or

alcoholism is a contributing factor material to the determination of disability is

whether [the Commissioner] would still find [the claimant] disabled if [the

claimant] stopped using drugs or alcohol."  20 C.F.R. § 416.935(b)(1).

To determine if Mr. L.'s alcohol use was a contributing factor to his

disability, the court uses a "two-step analysis." Rehder, 205 F.3d at 1060.

"First, the ALJ should determine which of the claimant's physical and mental

limitations would remain if the claimant refrained from drug or alcohol use.

Then, the ALJ must determine whether the claimant's remaining limitations

would be disabling."  Id.; see 20 C.F.R. § 416.935(b)(2).  "If the claimant's

45

remaining limitations would not be disabling, the claimant's alcoholism or drug

use is a contributing factor material to a determination of disability and

benefits will be denied." Id.; see 20 C.F.R. § 416.935(b)(2)(i).  "If the claimant

would still be considered disabled due to his or her remaining limitations,

[Mr. L.] is disabled and entitled to benefits." Id.; see 20 C.F.R.

§ 416.935(b)(2)(ii).

"The burden of proving that alcoholism was not a contributing factor

material to the disability determination falls on [the claimant]." Brueggemann

v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003) (citing Estes v. Barnhart, 275

F.3d 722, 725 (8th Cir. 2002)).  But "[i]f the ALJ is unable to determine

whether substance use disorders are a contributing factor material to the

claimant's otherwise-acknowledged disability, the claimant's burden has been

met and an award of benefits must follow." Id.

In 2013, "the Social Security Administration . . . implemented a Social

Security Ruling ("SSR") to assist in the interpretation of 42 U.S.C.

§ [1382c(a)(3)(J)] and 20 C.F.R. [§ 416.935(b)])." Whittle v. Berryhill, 4:18-CV-

04095-VLD, 2019 WL 2124247, at *28 (D.S.D. May 15, 2019); see SSR 13-2p.

"SSR 13-2p, § 5 directs that the SSA follow a six-step procedure to evaluate

whether DAA is material to a claimant's disability." Id.  These steps, in

relevant part, are:

(1)    Does the claimant have DAA?  If no, then no DAA materiality
       determination is necessary.  If yes, go to step two.

(2)    Is the claimant disabled including all impairments, including DAA?
       If no, do not determine DAA materiality and deny the claim.  If yes,
       go to step three.

46

(3)     Is DAA the only impairment?  If yes, DAA is material and deny the claim.  If no, go to step four.

(4)     Is the other impairment(s) disabling by itself while the claimant is still dependent upon or using drugs/alcohol?  If no, DAA is material to disability and deny the claim.  If yes, go to step five.

(5)     Does DAA cause or affect the claimant's medically determinable impairment(s)?  If no, DAA is not material and allow the claim.  If yes, but the other impairment(s) is irreversible or could not improve to the point of non-disability, DAA is not material and allow the claim.  If yes, and DAA could be material, go to step six.

(6)     Would the other impairment(s) improve to the point of non-disability in the absence of DAA?  If yes, DAA is material and deny the claim.  If no, DAA is not material and allow the claim.

Whittle, 2019 WL 2124247, at *29 (quotations omitted).  See SSR 13-2p, § 5.

Because the ALJ found Mr. L. to have a severe impairment of depression, SSR 13-2p, § 7 also applies.  Under section 7, the Commissioner recognized that "[they] do not know of any research data that [they] can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol."  SSR 13-2p, 2013 WL 621536, at *9.  Thus, to determine if DAA is material, there needs to be "evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA.  Unlike cases involving physical impairments, we do not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental disorder."  Id.  Section 7 of SSR 13-2p also provides that the Commissioner "may purchase a [consultative exam] in a case involving a co-

occurring mental disorder" to help determine "whether a claimant who has no treating source records has a mental disorder(s) in addition to DAA." Id.

SSR 13-2p, § 9 is also instructive. When considering abstinence from drug or alcohol abuse, "the claimant should be abstinent long enough to allow the acute effects of drug or alcohol use to abate." SSR 13-2p, 2013 WL 621536, at *12. In addition, evidence of how the claimant functioned while abstinent *outside of* a highly structured environment (like a mental hospital or substance abuse treatment center) is required. Id. Because Mr. L.'s case involves depression, a co-occurring mental disorder, "the documentation of a period of abstinence should provide information about what, if any, medical findings and impairment-related limitations remained after the acute effects of drug or alcohol use abated." Id.

SSR 13-2p also addresses what explanations the ALJ must provide in making its DAA analysis. The ALJ must provide enough information so that a reviewing party can understand the ALJ's finding that the claimant has DAA, understand whether the claimant is disabled at steps 3 or 5 *with* DAA, and understand whether the claimant would still be disabled *minus* DAA. Id. at § 14, 2013 WL 621536, at *14-15. There is no requirement that the ALJ recite SSR 13-2p, discuss each step of the six-step inquiry described in SSR 13-2p, or discuss each step in detail. Id.

### b.    The ALJ Failed to Properly Evaluate Mr. L.'s DAA Impairment.

Mr. L. argues the ALJ failed to evaluate his DAA impairment "by not following SSR 13-2p and supporting his findings with the evidence required by

48

SSR 13-2p when co-occurring mental impairments are present." <u>See</u> Docket No. 18, p. 6.  The Commissioner disputes this, arguing "the ALJ properly concluded that [alcohol] abuse was a material factor to the determination of disability." <u>See</u> Docket No. 20, p. 6.

To determine if Mr. L.'s alcohol abuse was a contributing factor to his disability, the court will analyze Mr. L.'s case pursuant to SSR 13-2p.  The first step of SSR 13-2p asks the ALJ to determine if Mr. L. suffers from DAA.  SSR 13-2p, 2013 WL 621536, at *5.  The ALJ found that Mr. L. "has severe impairments [of] epilepsy; chronic obstructive pulmonary disease (COPD); depression and alcohol abuse." T17.  So, the answer to step one is yes.

The second step asks the ALJ if "the claimant [is] disabled considering all impairments, including DAA."  SSR 13-2p, 2013 WL 621536, at *5.  Here, the ALJ found that "including substance abuse disorder, [Mr. L.] is unable to make a successful vocational adjustment to work existing in significant numbers in the national economy.  A finding of 'disabled' is thus appropriate under a framework application of the above rule." T23.  Therefore, the answer to step two is yes.

The third step asks the ALJ to determine if "DAA [is] the only impairment."  SSR 13-2p, 2013 WL 621536, at *5.  Here, because the ALJ found the other severe impairments of epilepsy, COPD, and depression, the answer to step three is no, and the court will continue to step four. <u>Id.</u>; T17.

The parties' contention lies at step four of SSR 13-2p.  At step four, the ALJ must determine if "the other impairment(s) [is] disabling by itself while the

claimant is dependent upon or abusing drugs or alcohol."  SSR 13-2p, 2013
WL 621536, at *5.  At step four, SSR 13-2p further explains, "A second
application of the sequential evaluation process may demonstrate that the
claimant's other physical or mental impairment(s) is not sufficiently severe to
establish disability by itself while the claimant is dependent upon or abusing
drugs or alcohol."  Id.  "When the claimant's other impairment(s) is not
disabling by itself, adjudicators must still apply the sequential evaluation
twice, first to show that the claimant is disabled considering all [medically
determinable impairments], including DAA, and a second time to show that the
claimant would not be disabled absent DAA."  Id. at *6.  Here, the ALJ
conducted the sequential evaluation twice—first concluding Mr. L. was
disabled when alcohol abuse was considered and, second, concluding Mr. L.
was not disabled absent alcohol abuse.  See T23; T27.

During the second sequential evaluation, the ALJ found Mr. L. would
have "no" limitation "[i]n understanding, remembering, or applying
information" if he stopped alcohol use.  T24.  This is the same finding the ALJ
had when alcohol use was considered with Mr. L.'s other impairments.  See
T18.  The ALJ reasoned that, while "[h]e has subjective reports of decreased
memory in the record[,] . . . if there is an impairment in his memory, it relates
primarily to alcohol use . . . .  On occasions, with no reports of alcohol use, his
memory was intact in all spheres."  T24 (internal cites omitted).

To support this, the ALJ first cited a Rapid City Regional Hospital record
documenting Mr. L.'s mental state while intoxicated:  "He is withdrawn.

50

Cognition and memory are impaired. . . .  He expresses suicidal plans.  He is

noncommunicative.  Smell of EtOH[9] about him; patient admits to alcohol use

tonight[.]  He is inattentive."  T732.

The ALJ then cited a Rapid City Regional Hospital Behavioral Health

Center record which showed that, while Mr. L. was not using alcohol, his

memory was intact in all spheres, his orientation to person, place, and time

was good, his behavior was appropriate, his judgment and impulse control

were fair, and his thought processes were linear, logical, and goal

oriented.  T699.  This record was made while Mr. L. was an inpatient at the

hospital.  Id.

The ALJ then found Mr. L. would have a "moderate" limitation "[i]n

interacting with others" if he stopped alcohol use.  T24.  This, again, was the

same finding the ALJ had when alcohol use was considered with Mr. L.'s other

impairments.  T18.  The ALJ reasoned that:

> "The claimant states he does not like to leave his living quarters,
> but this does not appear to relate to anxiety or issues in getting
> along with others. . . .  [H]e generally presents as pleasant and
> cooperative with appropriate behavior[.]"

T24 (internal cites omitted).  To support this, the ALJ cited records from Avera

Behavioral Health showing that, when Mr. L. was not using alcohol or

intoxicated, he was cooperative, engaging, pleasant, in a good mood, had fair

judgment and insight, and had good concentration and intact memory.  See

T1128, 1145, 1199.  "However, with alcohol use, there [were] reports of

---

[9] EtOH is the chemical title for ethanol, the intoxicant in alcoholic drinks.

suicidality and anxiety, which would have an adverse influence on his ability to get along with others or handle stress." T24; See T437.  Each of the records the ALJ cited to prove Mr. L.'s functioning when sober were records generated at the end of a multi-day stay at a hospital.  See T24 (citing T1128 (documenting Mr. L.'s mental status after a four-day stay at the hospital and Avera Behavioral Health); T1145 (documenting mental status at the end of a two-day hospital stay); and T1199 (documenting mental status at the end of a six-day hospitalization)).

The ALJ found "[a]s to concentrating, persisting, or maintaining pace, the claimant has a mild limitation." T24.  This was the same finding the ALJ had during the first sequential evaluation of Mr. L.'s disability when alcohol abuse was considered.  T19.  The ALJ reasoned that "[Mr. L.] testified to poor ability to concentrate well on things that he reads or watches.  He said he sometimes must re-watch something he has seen to be able to explain it to another." T24-25; See T54.  However, the ALJ found that "per the record, [Mr. L.] has good concentration . . . .  On exam, he did not demonstrate any significant concentration issues." T25 (internal cites omitted).  In support of this conclusion, the ALJ cited to two Rapid City Regional Hospital records and an Avera Health record which all stated he had no significant issues with concentration.  See T547, 585, 1057.

However, the ALJ found "[a]s for adapting or managing oneself, [Mr. L.] has a moderate limitation" when not using alcohol and "a marked limitation" when alcohol use is considered.  Compare T25 with T19.  The ALJ reasoned:

52

> The medical record demonstrates diminished functioning due to
> alcohol abuse, which could have an adverse influence on his ability
> to leave his living area or go to work consistently as noted in the
> RFC assessment. . . .  In all, this issue with alcohol would result in
> marked limits in this area.  However, outside of alcohol use, he
> does not appear to be so limited.  He testified that he no longer
> drinks heavily and certainly not to a point of intoxication.  He
> appears to be taking his medications regularly without issue,
> including medication for his seizures. . . .  He attends counseling,
> which demonstrates ability to take care of himself in this area and
> have insight into his treatment needs.

T25 (internal citations omitted).

Due to the change in limitations during the second sequential evaluation,

the ALJ determined a new RFC for Mr. L. if he were to stop using alcohol.

T25-26.  The ALJ found that "[i]f the claimant stopped substance use, he has

the RFC to perform medium work" as opposed to performing "less than a full

range of medium work" if substance abuse were included.  Compare T25 with

T20.  Additionally, the ALJ found that "[w]hen substance abuse is active and

material, [Mr. L.] would be markedly limited in adapting and likely be absent

two to three days of work per month."  This language is not included in the

ALJ's second RFC.  Compare T20 with T25-26.

Ultimately, the ALJ found that "the record shows [Mr. L.'s] alcohol use

and [accompanying] non-compliance with medication result in exacerbation of

his symptoms of seizures and depression. . . .  [T]his is not supportive of

disability."  T26-27.  "[T]he seizures are under reasonable control when taking

his prescription medications.  He testified that he is no longer drinking heavily

and appears to be taking his medications as prescribed.  There are no

significant hospital stays later in the record, and it appears his alcohol abuse has decreased." T27.

Mr. L. takes issue with this last assessment, arguing that he *was* hospitalized November 27, 2019.  Docket No. 18 at pp. 7-8.  On that date, Mr. L. was taken to the Avera ER after authorities were alerted when he burned his food; Mr. L. believed he had had a seizure and did not want to be alone. T954.  He was found to have elevated alcohol levels at this time, no evidence of a seizure was found, and he was sent to detox the same day.  T955.  This was over four months before the ALJ hearing, which occurred April 3, 2020, and it does not appear Mr. L. was admitted to the hospital.  Thus, the ALJ's observation that Mr. L. had not had any significant hospital *stays* appears supported by the record.  Nor do the litany of minor matters for which Mr. L. was treated between November and April constitute hospital "stays."

The ALJ's reasoning enjoys some support in the record.  See T689 ("It is unclear whether his seizures are alcohol related [or] alcohol withdrawal related. He is currently intoxicated."); T692 ("I suspect that he did not actually have a seizure," as he is intoxicated.); T693 ("[Mr. L.] states he has been out of his medications for 4-5 days. . . .  [Drinking] is the only thing that helps him cope with the pain. . . .  [Mr. L.] admit[s] that drinking alcohol increases his suicidal thoughts."); T696 ("[Mr. L.] presents with concerns over his safety due to his attempting to hang himself by a tree in the park where he was intoxicated on alcohol."); T710 ("He denies any hallucinations or recent associated seizures."); T1199; T58 (Mr. L.'s testimony).

Because the ALJ found Mr. L. had "the RFC to perform a full range of medium work" if he were to stop using alcohol, the ALJ found there were "jobs existing in significant numbers in the national economy [Mr. L.] [could] perform." T27.  Thus, "[a] finding of 'not disabled' [was] therefore appropriate," and "[t]he substance use disorder [was] a contributing factor material to determining disability . . . ."  Id.

Mr. L. argues that the ALJ "failed to mention SSR 13-2p in his decision." Docket No. 18, p. 6.  While the ALJ did not mention the ruling by name, the ALJ appears to have followed the procedure set forth in SSR 13-2p.  First, the ALJ conducted the sequential analysis twice—first showing Mr. L. was disabled when alcohol abuse was considered and, second, showing Mr. L. was not disabled absent alcohol abuse—as required pursuant to SSR 13-2p.  See T23, T27; SSR 13-2p, 2013 WL 621536, at *6.  As stated above, the ALJ found that Mr. L. had the severe impairments of "epilepsy, [COPD], depression and alcohol abuse," so the answer to step one was "yes."  T17; SSR 13-2p, 2013 WL 621536, at *5.  The ALJ then found that Mr. L. would be disabled if alcohol abuse were considered, thus the answer at step two was "yes."  T23; SSR 13-2p, 2013 WL 621536, at *5. At step three, the ALJ found there were other impairments besides alcohol abuse, so the answer was "no."  Id.

At step four, the ALJ found the other impairments of epilepsy, COPD, and depression were not disabling by themselves while Mr. L. was dependent upon alcohol.  Id.; T27.  Because the ALJ determined the answer at step four was "no," it concluded DAA was material, and the ALJ did not need to continue

the steps under SSR 13-2p.  Id.  Again, "[w]hen the claimant's other impairment(s) is not disabling by itself, adjudicators must still apply the sequential evaluation twice, first to show that the claimant is disabled considering all [medically determinable impairments], including DAA, and a second time to show that the claimant would not be disabled absent DAA." SSR 13-2p, 2013 WL 621536, at *6.

Here, the ALJ fulfilled the procedural requirements of SSR 13-2p.  While the ALJ may not have mentioned SSR 13-2p by name, it is apparent from its decision that all the necessary determinations were made and were articulated sufficiently to allow review by this court.  See SSR 13-2p, § 14.  Mr. L. fails to cite any case law supporting his contention that the ALJ must "mention SSR 13-2p in his decision."  Docket No. 18, p. 6.

Mr. L.'s second assertion goes to the substance of the evidence relied upon by the ALJ when analyzing Mr. L.'s DAA.  He  asserts the ALJ failed to support "his findings with the evidence required by SSR 13-2p when co-occurring mental impairments are present" and failed to point to evidence "to establish that [Mr. L.] would not be disabled absent DAA."  Docket No. 18, p. 6. Because Mr. L. has the co-occurring mental impairment of depression, to determine if DAA is material, there needs to be "evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA."  SSR 13-2p, 2013 WL 621536, at *9. In addition, "[the Commissioner] do[es] not permit adjudicators to rely exclusively on medical expertise and the nature of a claimant's mental

disorder."  Id. (emphasis added).  In addition, there must be evidence of the claimant's functioning while sober *outside of a structured setting such as a hospital or substance abuse treatment center.*  Id. at *12.

Mr. L. asserts that when discussing his RFC, "the ALJ discussed issues with medication noncompliance and seizures rather than pointing to evidence of what [Mr. L.'s] condition and work abilities would be or were when he abstained from alcohol."  Docket No. 18, p. 6.  As discussed above, the citations to the record made by the ALJ concerning Mr. L.'s functioning when sober appear to have been exclusively records created during or at the end of multi-day stays as an inpatient in structured settings.  SSR 13-2p requires evidence of mental functioning during periods of abstinence *without* the supporting environment of a structured hospital or substance abuse treatment setting.  The ALJ did not cite to this type of evidence to support its conclusions about Mr. L.'s sober mental functioning.

Mr. L. also asserts the ALJ's finding that Mr. L. "attends counseling, which demonstrates ability to take care of himself in this area" is false and that the appeal record contains no counseling records.  See Docket No. 18, p. 8.  However, Mr. L. is mistaken.  While the ALJ's citation to Exhibit 6F, page 7 does not appear to be a counseling record, the appeal record contains ample evidence showing Mr. L. regularly attended counseling at SEBH.  See T842-908.  Mr. L.'s latest counseling session was on February 26, 2020, only a few months before his hearing.  T854.  At this session, the therapist indicated "[Mr. L.] stated things are going fine and medications are working well."  Id.

57

Finally, Mr. L. provided multiple record cites, primarily focused on his own testimony, to support that he would be disabled absent his alcohol use. See Docket No. 18, pp. 7-10.  First, Mr. L. testified that while he had "cut back quite a bit" on drinking, he still gets anxious and depressed "two, three times a week."  See T45, 58.  Next, Mr. L. testified that that he continues to have suicidal thoughts and "after the last one, I think it was, when they shipped [me] down to Yankton."  T58.  Mr. L. also discussed his testimony on how he continues to get frustrated easily, gets upset about the death of his partner, gets depressed to the point of wanting to stay away from everyone, and at times has a dependence on friends and family when he is depressed.  T46-49.  Beyond his testimony, Mr. L. asserted that "the ALJ made no finding regarding the opinions of either the State agency psychological consultant or the psychological expert who testified at the hearing as to what [Mr. L.'s] limitations would be if he were to abstain from alcohol abuse . . . ."  Docket No. 18, p. 9.

Here, paragraph 7 of SSR 13-2p is crucial:  it describes how an ALJ is to evaluate the evidence when a claimant has a DAA disability and a co-occurring mental disorder.  The Commissioner has said that, under those circumstances, an ALJ may not rely "*exclusively* on medical expertise and the nature of a claimant's mental disorder" in determining the effect of the mental disorder without the DAA.  See SSR 13-2p, § 7(b) (emphasis added).  Here, the ALJ relied on the consultative examination and accompanying testimony of Kevin Schumacher, Ph.D., LP, as to the effects of Mr. L.'s mental disorders on his

ability to function if the effects of his DAA were disregarded.  It is not clear what else the ALJ relied upon.  The ALJ cited to medical records reflecting Mr. L.'s functioning when sober, but those medical records were created while Mr. L. was an inpatient; SSR 13-2p requires that periods of abstinence *outside* of a structured setting must be considered.  The ALJ never acknowledged this requirement of SSR 13-2p, either explicitly or implicitly by reference to evidence of sober mental functioning outside of a structured setting.  There may be other records in the administrative record reflecting Mr. L.'s mental functioning at times when he is sober and not an inpatient, but the court will not guess what the ALJ may or may not find persuasive about those records. The ALJ must analyze the records in the first instance and make its finding.

The inability of this court to suss out the ALJ's reasoning on the effect of Mr. L.'s mental disorder *without* his DAA is further complicated, as discussed below, by the ALJ's failure to obtain records from the Human Services Center at Yankton, South Dakota, where Mr. L. was an inpatient repeatedly for either mental health care, substance abuse treatment, or both.  Because, as discussed below, the court is remanding with instructions for the ALJ to obtain these very important missing records, the court will remand on the DAA issue also.  On remand, the ALJ is instructed to discuss the effect of Mr. L.'s mental disorders on his functioning without his DAA, taking into account not only medical expertise and the nature of his mental disorder, but also his functioning during periods of abstinence *outside* of a structured hospital setting.  See SSR 13-2p, §§ 7(b) and 9(d)(i – iii).

## 2. Whether the Commissioner Fully and Fairly Developed the Record

Mr. L. asserts "[t]he Commissioner failed to fully and fairly develop the record" regarding: (1) inpatient treatment records from the Human Services Center ("HSC") in Yankton and (2) several "shoulder, arm, and hand injuries that the ALJ never addressed in [the] decision." See Docket No. 18, pp. 10, 12.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citing Nevland, 204 F.3d at 858). "The ALJ's duty to develop the record extends even to cases . . . where an attorney represented the claimant at the administrative hearing." Id. (citing Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983)). "[I]f the medical records presented to [the ALJ] do not give sufficient medical evidence to determine whether the claimant is disabled," the ALJ must develop the record further. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011) (citing Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986)). In doing so, the ALJ "may recontact [a] medical source[;] . . . may request additional existing evidence; . . . may [order] a consultative examination[;] . . . or ask [the claimant] or others for more information." See 20 C.F.R. § 416.920b(b)(2)(i-iv). However, this is true "only if a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (citing Stormo, 377 F.3d at 806).

### a. The ALJ Did Not Fully and Fairly Develop the Record Because It Did Not Obtain the HSC Records.

Mr. L. asserts the ALJ failed to develop the record fully and fairly by neglecting to obtain his inpatient treatment records from HSC in Yankton, South Dakota.  See Docket No. 18, pp. 11-12.  According to Mr. L., "[his] testimony gave the ALJ clear notice" he had been treated at HSC—and records were therefore generated—when he testified that he had been "shipped down to Yankton."  Id.  Here, Mr. L. argues the ALJ should have known he was referring to the state psychiatric hospital, HSC, when he made this statement.[10]  Id.; see also T58.

The Commissioner disputes that the ALJ should have interpreted Mr. L.'s "non-specific comments" about being " 'shipped down to Yankton,' to mean that additional records were necessary [and available] from [HSC]."  See Docket No. 20, p. 10.  The Commissioner argues "[Mr. L.], who was represented at the hearing, also did not indicate that more records from [HSC] were necessary" or provide any details on what exactly the additional treatment was.  Id. (citing Lacroix v. Barnhart, 465 F.3d 881, 886 (8th Cir. 2006) and Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993)).

In Lacroix, the Eighth Circuit held that, "[w]hile [the claimant] argue[d] that the ALJ should have further developed the record to determine whether an acceptable medical source participated in her care . . . she has presented no

---

[10] HSC provides in-patient psychiatric care, but also provides separate care for substance abuse treatment.  It is unclear whether Mr. L. received mental health treatment, substance abuse treatment, or both when he was an inpatient at HSC.

evidence suggesting that such an inquiry would have yielded an affirmative answer." Lacroix, 465 F.3d at 886.

In Onstad, the claimant similarly argued "the record [was] not fully developed because some medical records were not obtained.  For instance, the results of psychological testing performed by a psychologist . . . ." Onstad, 999 F.2d at 1234.  The Eighth Circuit stated they "[were] not convinced that these results . . . would be important enough to make a difference in the circumstances of this case." Id.  And "[w]hile the ALJ has a duty to develop the record fully and fairly . . . even when a claimant has a lawyer, it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about." Id. (internal citation omitted).  Thus, the Onstad court held the ALJ did not err in failing to develop the record. Id.

Unlike Onstad, additional inpatient psychiatric treatment records from HSC would certainly "be important enough to make a difference in the circumstances of [Mr. L.'s] case." Id.  Ultimately, the ALJ found Mr. L. suffered from the "severe impairments [of] epilepsy, [COPD], depression, and alcohol abuse," but that he could perform work at the medium level without his DAA. T25-26.  This conclusion may be buttressed or contradicted by the additional inpatient psychiatric treatment records from HSC and would provide more guidance to the ALJ in his disability determination under SSR 13-2p.

Again, these records could be requested "only if a crucial issue is undeveloped." Ellis, 392 F.3d at 994 (citing Stormo, 377 F.3d at 806).  The

"crucial issue" here is whether Mr. L.'s depression persisted when he was sober within or without a structured treatment environment.  The court believes this issue was undeveloped.  If the HSC psychiatric records revealed Mr. L. continued to suffer from his severe impairment of depression when alcohol abuse was not a factor, it could change the ALJ's determination of Mr. L.'s RFC and whether he would be considered disabled pursuant to SSR 13-2p absent his DAA.  The HSC records and the length of Mr. L.'s stays at HSC hold the potential to be very illuminating on this critical issue.

Eighth Circuit precedent consistently "confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  Snead, 360 F.3d at 838 (citing Nevland, 204 F.3d at 858).  This responsibility applies even "where an attorney represented the claimant at the administrative hearing."  Id. (citing Warner, 722 F.2d at 431).

If the ALJ was not able to make the connection between Mr. L.'s off-the-cuff comment during his testimony and the missing records from HSC, there is ample other evidence in the record which provided notice to the ALJ that Mr. L. had inpatient psychiatric stays at HSC.  See T758 ("Throughout this hospitalization his main intent was to get to HSC for continued treatment of mental health and substance abuse."); T768 ("Patient was admitted to psychiatric unit on a voluntary basis.  Was in Yankton for two weeks . . . ."); T1062 (Discharged to "Yankton HSC."); T1035 ("arrangements were made for transfer to HSC for ongoing psychiatric care.").  Therefore, because Mr. L.'s

severe impairments of depression and alcohol abuse are "crucial issues" to his disability determination, remand is appropriate for the ALJ to further develop the record by obtaining Mr. L.'s treatment records from HSC.

> **b.   The ALJ Fully and Fairly Developed the Shoulder, Arm, and Hand Impairment Records.**

Mr. L. also asserts that because he "had a number of shoulder, arm and hand injuries that the ALJ never addressed in decision," the ALJ should have "either contacted a treating source, requested additional records, or ordered a consultative examination."  Docket No. 18, pp. 11-13.  According to Mr. L., these impairments were "crucial" because "if any of those impairments . . . precluded [Mr. L.] from medium exertion work, . . . [Mr. L.] would be limited to light exertion work and found disabled based under the grids due to his limitations and age."  Id. at 12.  The Commissioner disagrees.  See Docket No. 20, p. 11.

"[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."  Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)).  While Mr. L. is correct that "accurate findings as to any upper extremity limitation(s) is a crucial issue in his case," Docket No. 18, p. 13, this court has determined that the ALJ did not fail in identifying all of Mr. L.'s impairments at step two.  See infra Section E(3).  In so holding, the court has concluded that Mr. L. has not met his burden of proving his upper extremity injuries—fractured collarbones, broken arm, and lacerated and infected hand—were "a severe impairment that significantly limited [his]

physical or mental ability to perform basic work activities" and the ALJ's step-two determination is supported by "substantial evidence [i]n the record as a whole." Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); Minor, 574 F.3d at 627 (citing Johnson, 108 F.3d at 179).

Therefore, this court finds that because the ALJ's step-two determination was supported by "substantial evidence," this crucial issue was not "undeveloped." Ellis, 392 F.3d at 994.  Thus, ordering a consultative examination, requesting additional records, and recontacting one of Mr. L.'s treatment providers was unnecessary.

### 3.   Whether the Commissioner Identified All of Mr. L.'s Impairments at Step Two and Included Resulting Limitations in His RFC

Mr. L. alleges "[t]he Commissioner failed to identify all of [Mr. L.'s] impairments at Step [Two] and include resulting limitations in his RFC." See Docket No. 18, p. 13.  "Step two . . . involves a determination, based on the medical evidence, whether the claimant has an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities."[11] Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (citing 20 C.F.R. § 416.920(a)(4)(ii)).  " 'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of

---

[11] "Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment, responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions."  Paula G.S. v. Saul, 4:20-CV-04041-VLD, 2021 WL 1599229, at *15 (D.S.D. Apr. 23, 2021) (citing 20 C.F.R. § 416.922(b).

impairments would have no more than a minimal impact on [his] ability to work.' " Id. (quoting Caviness, 250 F.3d at 605).

"If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3rd Cir. 2003). "Reasonable doubts on severity are to be resolved in favor of the claimant." Id. at 547; see also Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) ("Any doubt as to whether the requisite showing of severity has been made is to be resolved in favor of the claimant.") (citing SSR 85-28).

Additionally, the Supreme Court has explained "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.' " Shinseki v. Sanders, 556 U.S. 396, 409 (2009) (quoting Palmer v. Hoffman, 318 U.S. 109, 116 (1943)); Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 36 (1963) (per curiam); Market Street R. Co. v. Railroad Comm'n of Cal., 324 U.S. 548, 562 (1945).

Mr. L.'s asserts that he "met his burden to show he had a medically determinable impairment(s) related to his arms and shoulder, and that it was severe." Docket No. 18, p. 17. This assertion primarily centers around Mr. L.'s broken left collarbone. Id. Mr. L. was seen in March 2018 after suffering from "an acute left clavicle fracture." T526. "Examination revealed normal range of motion and no CVA tenderness in the back; mild non-intention tremors in the bilateral extremities with tenderness to palpation in the left shoulder along

66

clavicle; symmetric pulses in all extremities; intact strength, sensation, and reflexes throughout." Docket No. 16, p. 7; T535-36. Mr. L. was then discharged with a shoulder sling and given pain medication. T541.

In March 2019, Mr. L. was seen at Falls Community Health and reported chronic pain due to a history of broken shoulders. T830. "Examination revealed no tenderness in the shoulders to light touch, but tenderness when palpating for pain, painful arc of pain with both arms, a visible deformity of the right shoulder due to a prior clavicle fracture, and no apparent loss of motion or weakness." Docket No. 16, pp. 15-16; T831.

In May 2019, Mr. L. was seen at Avera McKennan Hospital and asked for hydrocodone for chronic arm pain several times. T1131. Mr. L.'s physical examination revealed "no evidence of rash deformity" and "no evidence of atrophy, EPS or TD." T1133. And in July 2019, Mr. L. reported to his therapist that he was still taking gabapentin for pain. T896. Mr. L. asserts these records show he had a severe impairment that caused lasting limitations. Docket No. 18, p. 16. The court disagrees.

Mr. L. "[has] the burden of showing a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities." Caviness, 250 F.3d at 605. Under 42 U.S.C. § 1382c(a)(3)(A), "an individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

67

than twelve months." See 42 U.S.C. § 1382c(a)(3)(A). Mr. L.'s Falls Community Health records reveal that, while Mr. L. complained of pain, "there does not appear to be any loss of motion or weakness." T831. In addition, in June 2019, Mr. L.'s physical examination revealed normal range of motion, gait, and station with no evidence of muscular atrophy. T994. Without Mr. L.'s broken collarbone limiting his range of motion or weakening him, it would not be an "impairment . . . that significantly limits the claimant's ability to perform basic work activities." T831; Page, 484 F.3d at 1043; see 20 C.F.R. § 416.920(a)(4)(ii).

Additionally, under § 1382c(a)(3)(A), the impairment must be "continuous" for at least one year. 42 U.S.C. § 1382c(a)(3)(A). A review of the record reveals that outside subjective complaints of pain, Mr. L. did not have a "continuous" impairment that "significantly limited [his] physical . . . ability to perform basic work activities." Page, 484 F.3d at 1043; Caviness, 250 F.3d at 605. In fact, the records show that within a year of injury Mr. L. exhibited a full range of motion, a lack of pain, a lack of tenderness to palpation, and full strength. See T390-91; T448; T471; T487; T492; T543-44; T546; T556; T599; T628; T674; T690; T732; T764; T955; T963; T1014. Therefore, the court concludes that the ALJ did not err in determining that Mr. L.'s "history of a fractured collarbone with repair . . . [did not] cause significant work-related limitations, and [it was] thus non-severe." T18.

Other than the left collarbone, Mr. L. asserts the ALJ failed to mention his "other fractured collarbone, broken left arm or lacerated and infected hand,

and committed error when he failed to recognize" them as severe impairments. Docket No. 18, p. 18. However, this argument fails as well. According to the medical records, Mr. L. was seen at Rapid City Regional Hospital on September 25, 2018, after being assaulted and struck in the right shoulder. T590. X-rays confirmed he had a fractured collarbone but the acuity[12] was suspect because there was no abrasion or large amount of soft tissue swelling around the area. T592. Mr. L. was given a sling, pain medication, and discharged. Id.

Next, Mr. L. was seen at Avera McKennan Hospital on February 3, 2020, after suffering multiple lacerations to his right hand. T944. But these lacerations were "small" and "superficial" and the tendon in the hand appeared stable/unaffected/normal. T945. Mr. L. was later seen at Avera on February 14, 2020, for a possible broken left arm, which was confirmed as a fracture of the left ulna. T938-39. But there was only "mild displacement," and Mr. L. had full range of motion in his wrists and shoulders and low amounts of pain. T939. Lastly, Mr. L. was seen at Avera on February 24, 2020, to drain an abscess in his right middle finger after his lacerated hand became infected. T922.

While Mr. L. may be correct that "[a] complete review of the record shows far more than the history of a fractured collarbone with repair mentioned by the ALJ," Mr. L. has failed to show that any of these medical issues rise to the level of impairment pursuant to 42 U.S.C. § 1382c(a)(3)(A). Mr. L. has not provided the court any evidence of how these afflictions—broken right

---

[12] Acuity is the level of severity of an injury.

collarbone, lacerated and infected hand, and broken left arm—"significantly limited [his] physical or mental ability to perform basic work activities" or continuously lasted for a "period of not less than 12 months."  Caviness, 250 F.3d at 605; 42 U.S.C. § 1382c(a)(3)(A).

Next, Mr. L. asserts the ALJ's review of the medical evidence "was selective and ignored other evidence," and leaves unclear his basis for determining that the "history of a fractured collarbone with repair" was non-severe.  See Docket No. 18, p. 14.  But the ALJ *did* rely on medical evidence when making this determination.  See Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (holding "[a]n administrative law judge may not draw upon his own inferences from medical reports") (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)).  The ALJ cited to T347 (an IHS record detailing a history of a fractured tibia and chronic low back pain); T356 (an IHS medical record detailing hand pain and medication usage); T359 (an IHS medical record detailing bilateral elbow pain, bilateral blisters on hands, and a history of a broken tibia); T422 (a list of medications Mr. L. was taking, including gabapentin for pain management); T743 (a medical record discussing both broken collarbones, shoulder pain, and depression); and T292-300 (a disability report discussing how Mr. L.'s broken left collarbone is a condition limiting his ability to work).  These records prove the ALJ considered most, if not all, impairments complained of by Mr. L. when determining that "they would not cause significant work-related limitations."  T18.

Mr. L. argues "[t]he ALJ failed to recognize [his] severe shoulder impairments, and carried that error into his RFC formulation, so the Step 2 error was not harmless to [his] claim."  Docket No. 18, p. 19.  Mr. L. cites to Perrin v. Berryhill to support this assertion.  Id.; Perrin v. Berryhill, 4:16-CV-04178-LLP, 2017 WL 7050670, at *22 (D.S.D. Nov. 27, 2017).  In Perrin, the ALJ determined that the claimant "had medically determinable impairments of obstructive sleep apnea, migraines, and other headaches, type 2 diabetes, and depression, all of which he determined were non-severe impairments."  Perrin, 2017 WL 7050670, at *2.  The claimant argued that "the Commissioner erred by failing to identify her chronic headaches as a severe impairment at step two," and "the ALJ's failure to consider her headaches as a severe impairment [was] not harmless error in her case, because the ALJ's analysis was completely silent as to what effect, if any, her headaches had upon her RFC." Id. at *18-20.

Ultimately, the Perrin court found harmful error.  Id. at *21-22.  The court reasoned that:

> The ALJ's recitation of Ms. Perrin's RFC . . . did not include any mention of whether [her] functional capacity was affected at all by limitations presented by [her] headaches.  Because the ALJ's own analysis deemed Ms. Perrin's headaches a medically determinable impairment, the ALJ was required to consider the effects of Ms. Perrin's headaches when formulating her RFC—even though the ALJ considered the headaches a non-severe impairment.
>
> But because the headaches were not mentioned at all in the ALJ's discussion regarding the RFC, it is impossible to determine whether any limitation within the RFC was attributed to Ms. Perrin's headaches.
>
> *      *      *

> Perhaps a minimal effect on her ability to work means only one migraine per month, or perhaps it means two instead of three. . . .  But the RFC analysis makes no mention of *any* affect [sic] that Ms. Perrin's migraine headaches, or lack thereof, [have] on Ms. Perrin's ability to work.  The court is left to speculate, therefore, about why this is so.  This case must be remanded for clarification of this issue.  Only then can this court sufficiently review the Commissioner's decision.

Id. (citations omitted).  However, Mr. L.'s case is different.

During the administrative hearing, the ALJ posed a hypothetical question to the vocational expert that discussed potential exertional limitations Mr. L. may have due to his physical impairments.  See T69-70.  Among them were limits on lifting, sitting, standing, climbing, reaching, balancing, and manipulating.  Id.  In addition, the ALJ claimed this hypothetical claimant may consistently miss two or three days a month.  T72.  The VE took these limitations into consideration and ultimately found that this hypothetical claimant could not perform Mr. L.'s past relevant work, but there were other jobs available "nationally" the claimant could do.  T71-72.

The ALJ then repeated many of these exertional limitations within his RFC determination, both with and without alcohol use.  See T20, 25-26.  Unlike Perrin, "[t]he court is [*not*] left to speculate" about the effects Mr. L.'s non-severe impairment of "a fractured collarbone with repair" has on his work abilities.  Perrin, 2017 WL 7050670, at *21-22.  This court finds Mr. L.'s reliance on Perrin unpersuasive.

Mr. L. seems to imply in his brief before this court that *chronic pain* from his broken shoulder/clavicle is what disables him.  Docket No. 18 at pp. 13-19.  But Mr. L. did not allege before the ALJ that he suffered from disabling pain,

either in his disability reports or in his testimony at the hearing.  T39-63, 290-316.  He alleged only the bare fact that his clavicle had been broken.  Id.  Many of the questions within the disability reports asking Mr. L. for details on his daily activities and abilities to lift, carry, walk, stand, sit, and climb were left blank.  See T290-316.

The court finds that Mr. L. has not met the burden of proving his upper extremities were "a severe impairment that significantly limited [his] physical or mental ability to perform basic work activities" and the ALJ's step-two determination is supported by "substantial evidence [i]n the record as a whole." Caviness, 250 F.3d at 605; Minor, 574 F.3d at 627 (citing Johnson, 108 F.3d at 179).  Thus, remand is not appropriate on this issue.

### 4. Whether the Commissioner Carried Her Burden at Step Five to Identify Jobs Mr. L. Could Perform Based on Substantial Evidence

Mr. L. asserts "[t]he Commissioner failed to carry her burden at Step Five" in identifying the number of jobs Mr. L. could perform "in the national economy."  See Docket No. 18, p. 19.  At the administrative hearing, the VE testified Mr. L. could work as a hand packager (DOT #920.587-018), grocery stocker (DOT #922.687-058), and laundry worker (DOT #361.685-018).  T71. The VE also specified there were 695,000, 240,000, and 208,000 jobs, respectively, available "nationally."  Id.  In other words, the VE testified there were 1.143 million jobs available of a type Mr. L. could perform "nationally."  Id.

Section 1382c(a)(3) of Title 42 provides in pertinent part as follows:

(A) Except as provided in subparagraph (C), an individual shall be considered to be disabled for purposes of this title [42 U.S.C. §§ 1381 et seq.] if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

(B) For purposes of paragraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  *For purposes of the preceding sentence* (with respect to any individual), *"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.*

See 42 U.S.C. § 1382c(a)(3)(A) & (B) (emphasis added).  See also 20 C.F.R. § 416.966(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.").

In SSR 85-15, the Commissioner clarified that "[w]henever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: . . . a statement of the incidence of such work in the region in which the individual resides or in several regions of the country."  See SSR 85-15, 1985 WL 56857, at *3 (Jan. 1, 1985); see also Welsh v. Colvin, 765 F.3d 926, 929 (8th Cir. 2014) (the Commissioner "must . . . provide a statement of the incidence of such work in the region where the

individual resides or in several regions of the country") (quoting SSR 96-9p, 1996 WL 374185, at *5 (July 2, 1996)).

In Barrett v. Barnhart, the Seventh Circuit, in a per curiam opinion, stated that "the principal significance of the 'other regions' language in the statute is to prevent the [Commissioner] from denying benefits on the basis of 'isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the applicant] live[s].' " Barrett v. Barnhart, 368 F.3d 691, 692 (7th Cir. 2004) (citing 20 C.F.R. § 404.1556(b)); see 20 C.F.R. § 416.966(b). The Barrett court stated they "have found only a few cases in which national numbers alone were cited as a basis for denying benefits." Id. (citing Kasarsky v. Barnhart, 335 F.3d 539, 543 (7th Cir. 2003) (per curiam); Mayes v. Massanari, 276 F.3d 453, 458 (9th Cir. 2001); Harmon v. Apfel, 168 F.3d 289, 292 (6th Cir. 1999)).

The VE in Mr. L.'s case testified only to the number of jobs available "nationally"—695,000 hand packager jobs, 240,000 grocery stocker jobs, and 208,000 laundry worker jobs—and did *not* testify to the number of jobs that would have potentially been available in Mr. L.'s region or in several other regions of the United States. T71. However, the number of jobs the VE testified to far surpasses what other circuits have found to be significant numbers of jobs. See Wood v. Comm'r of Soc. Sec., No. 19-1560, 2020 WL 618536, at *6 (6th Cir. Jan. 31, 2020) ("[T]he vocational expert's testimony here that approximately 467,000 suitable jobs exist 'in the country' is enough to support a determination that Wood can perform other work.").

75

Previously, this court *was not* "willing to take a factual leap of faith about the availability of jobs in fly-over country" when the number of jobs available was not significant.  See Heather R. v. Saul, 4:20-CV-04082-VLD, 2021 WL 3080331, at *25 (D.S.D. July 21, 2021).  However, the VE in Mr. L.'s case testified to more than double the number of jobs this court dealt with in Porter and identified common jobs that are available in almost every state, region, and town throughout the United States.  T71; see Porter v. Berryhill, 5:17-CV-05028-VLD, 2018 WL 2138661, at *62-63 (D.S.D. May 9, 2018) (the VE identified 440,000 jobs).

Were this court to affirm the ALJ's decisions at steps one through four, the court might be willing to take a leap of faith in this case that, if there are 1.143 million jobs available in the nation that Mr. L. can perform, and given that the jobs identified by the VE in this case are non-esoteric jobs that likely can be found in Mr. L.'s region (South Dakota, North Dakota, Minnesota, Nebraska and Iowa), there are significant numbers of those jobs available in Mr. L.'s region or several regions of the country.

But this court is not affirming the ALJ's analysis at steps one through four.  The court has identified two issues that may ultimately affect the RFC the ALJ arrives at once it follows the analysis set forth in SSR 13-2p and obtains the missing records from HSC.  Because of that uncertainty, the court does not affirm the ALJ's step five determination.  Instead, the ALJ is directed to revisit step five after resolving the other two issues identified that impact the step four analysis.  Since the ALJ will have a fresh chance to look at step five, it

is encouraged to obtain evidence of jobs Mr. L. can do that are in his region or in several regions of the country as the statute requires.

**F.     Type of Remand**

Mr. L. requests reversal of the Commissioner's decision with remand for further development.  <u>See</u> Docket No. 18, p. 21.  For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record as to the issue of Mr. L.'s mental functioning absent his DAA and the missing HSC inpatient records.  <u>See</u> *supra* Sections E(1)(b) and E(2)(a).

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g). "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " <u>Efinchuk v. Astrue</u>, 480 F.3d 846, 848 (8th Cir. 2007) (quoting <u>Mason v. Barnhart</u>, 406 F.3d 962, 964 (8th Cir. 2005)).  It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98-99 (1991)).  A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " <u>Id.</u> (quoting 42 U.S.C. § 405(g)).

"A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling." Id.  A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." Id. at 1011 (quoting Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)).  "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." Id. (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented with the HSC records, clarified, and properly evaluated under SSR 13-2p.  See also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) ("an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability").  Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby:

ORDERED that the Commissioner's decision is AFFIRMED IN PART AND DENIED IN PART and REMANDED for reconsideration pursuant to 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405(g), sentence four.  Mr. L.'s motion to reverse [Docket No. 17] is GRANTED in part and denied in part and the Commissioner's motion to affirm [Docket No. 19] is DENIED in part and granted in part.

DATED this 4th day of May, 2022.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge